[No. H001762. Sixth Dist. Mar. 3, 1989.]

J. R. NORTON COMPANY, Plaintiff and Respondent, v.
GENERAL TEAMSTERS, WAREHOUSEMEN AND HELPERS
UNION, LOCAL 890, Defendant and Appellant.

---

## COUNSEL

Harray, Hudson & Kingsley and Kay T. Kingsley for Defendant and Appellant.

Ball, Hunt, Hart, Brown & Baerwitz, David G. Finkle, Gary Micon, and Finkle, Hersh & Stoll for Plaintiff and Respondent.

---

## OPINION

**PREMO, J.**—General Teamsters, Warehousemen and Helpers Union, Local 890 (the Local) appeals from a jury verdict awarding compensatory and punitive damages to J. R. Norton Company for losses caused by negligent supervision of strikers during a 1982 labor dispute. The Local contends that the trial court gave conflicting instructions, erroneously giving the California common law agency liability and preponderance-of-the-evidence standard of proof, and correctly instructing in the language of section 6 of the Norris-LaGuardia Act (29 U.S.C.A. § 106).[1] The Local maintains that the

---

[1] 29 United States Code Annotated section 106 (hereinafter referred to as section 6) provides: "No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents,

section 6 standard of "clear proof" of actual participation in, approval of, or ratification of members' misconduct preempts state law, and that the erroneous instruction created an irreconcilable conflict. Therefore, the judgment in favor of J. R. Norton Company (Norton) should be reversed. Appellant also complains of various errors relating to the punitive damages.

We hold that section 6 does not preempt state law in this respect and find that appellant's further contentions are without merit.

## PROCEDURAL BACKGROUND

This action arises out of a labor dispute six years ago between striking members of the Local and Norton, an Arizona farming corporation. After violence on the first day of picketing on September 21, 1982, Norton sued the Local, the International Teamsters Union (the International), and numerous individual strikers for injunctive relief and damages. A temporary restraining order was granted by the second day of the strike, but incidents of violence and intimidation continued during the next few weeks. In 1986, the claims for damages were brought to trial against the Local, five named individual defendants, and the International.

Norton alleged a conspiracy to commit unlawful acts among the defendants, tortious interference with business by all the defendants, a violation of Civil Code section 51.7[2] alleging violence or intimidation in a labor dispute, and negligent supervision of the strike by the Local and the International. Norton claimed $637,106 in lost profits.

The jury found the five individual defendants liable for both conspiracy and wrongful conduct other than negligent supervision; found the individuals in violation of Civil Code section 51.7 and assessed a fine against them pursuant to Civil Code section 52, subdivision (b);[3] found the Local liable for negligent supervision; and found both the Local and the individuals had

except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."

[2] In 1982, Civil Code section 51.7 provided: "All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of their race, color, religion, ancestry, national origin, political affiliation, sex, or position in a labor dispute." (See Stats. 1976, ch. 1293, § 2, p. 5778.)

[3] In 1982, Civil Code section 52, subdivision (b) provided: "Whoever denies the right provided by Section 51.7, or whoever aids, incites, or conspires in such denial, is liable for each and every such offense for the actual damages and ten thousand dollars ($10,000) in addition thereto, suffered by any person denied such right. In the case of multiple offenders, the ten thousand dollar ($10,000) fine shall be prorated between them." (See Stats. 1981, ch. 521, § 1.)

acted with oppression and malice, and awarded and apportioned punitive damages. Local's share of the compensatory damages was $252,000 and of the punitive damages was $360,000. Local is the only party involved in this appeal.

FACTS

In 1982, Norton farmed lettuce on a rotational system in Gilroy, Blythe, and the Imperial and Salinas Valleys in California, as well as in parts of Arizona and New Mexico.

Local was the elected representative of Norton employees whose job duties included driving haul trucks with box stitching machines from the truck shops on Norton's ranches to the lettuce fields. There, they stitched and folded boxes containing the harvested lettuce, and hauled them to the cooling shed for further handling. The employees who actually harvested the lettuce were not part of the Local and were not on strike. Some employees at the cooler walked off their jobs in sympathy with the strikers, but they were members of an AFL-CIO union and were not themselves on strike.

Negotiations took place between April and July of 1982. The negotiating committee was comprised of three individuals elected by Local's total membership, which had also authorized the strike. On September 21, 1982, the committee did call a strike, in conformity with the bylaws of the Local and the International. The International paid strike benefits.

Norton's causes of action arose from threats and violence centered at the Salinas Cooling Company, but also occurring at Norton's four lettuce ranches (Airport, Martin, Bungard Hart, and Firestone), all within three to four miles of the cooler.

On the first day of the strike, Norton was not harvesting, since it was "up on [its] fields." Between 15 and 30 pickets blocked the entrance to the Airport Ranch, at least one holding a rock. This interfered with Norton's plan to move its trucks to the cooler for safekeeping. Sheriff's deputies were called and there was pushing and shoving. One striker, who was also a negotiating team member, was arrested. Strikers followed Norton's drivers to the cooler, but there was no violence. The arrested striker was dropped off at the union hall at his request after he was booked.

Harvesting started at the Firestone Ranch on the second day. Sheriff's deputies again had to clear the road at Airport Ranch for trucks to be taken

to Firestone. Only two trucks were taken out, and the picketers banged their signs on the trucks as they passed. A stitcher, that had been assigned before the strike to a striking employee, broke. Parts had been put in upside down, and other parts were missing. Sabotage by the employee was suggested. Spikes and nails were thrown on the roadways and under labor crew buses causing flat tires.

By the end of that day, Norton had obtained a temporary restraining order prohibiting violence and limiting the number and locations of pickets. Norton also postponed harvesting for seven days. Notwithstanding the restraining order, however, "it got more hectic everyday [*sic*] . . . seemed like more apt to have violence everyday [*sic*] as the days progressed," according to an eyewitness. Strikers tried to pull one Norton employee out of the truck he was driving, and threw rocks, breaking its windshield. A Norton field supervisor saw picketers hanging on to the windows and mirrors of trucks leaving the Airport Ranch and hitting the trucks with signs. One driver was shot at (his windshield was smashed). Another was told "there was going to be blood." A group of strikers confronted replacements at the motel where they were staying, leaving them all "pretty much scared for our life [*sic*]." Strikers would drive head-on toward Norton trucks; drive in front of the trucks and slow down, preventing the trucks from changing lanes or making turns; and throw rocks and bottles at trucks.

Norton complained of much of this activity in two Mailgrams sent to the Local on October 5 and 11. The Local president visited the picket line only once. He received periodic reports from the Local's business agent, who was in charge of the negotiating committee, sat on the Local's executive board, and was in charge of coordinating the strike. The president said that aside from the business agent, no one at the union, other than the picketers, was aware of who was picketing or of the location of the lines. The president disbelieved Norton's claims of strike violence and did not take steps to determine which strikers, if any, were involved.

The business agent testified that no picket captains were ever selected, nor did he give pickets any directions. Even after Norton complained of violence, no one was chosen to report to the Local about the strikers' conduct, although the business agent did speak to strikers about the allegations and did receive a denial. However, the business agent could not recall which strikers he had talked to or how many times he visited the lines. When he did visit the picket lines, he spoke "to them in general, keeping they're [*sic*] morales up."

The Local's attorney visited the picket line twice, for about 15 minutes each time. After receiving the temporary restraining order, she gave a copy

of the order to a striker, who testified that she told him to reduce the number of pickets.

She represented the arrested striker/negotiator, in a criminal action, free of charge. The striker was reimbursed for the fine, and received about $3,000 from the International for his negotiating and picketing activities. He and other strikers were authorized by the Local to charge food and gasoline for strike-related activities.

The strike lasted until December 1982, although there was no evidence of strike activity in the Salinas Valley after mid-October. As a result of the strikers' activities, Norton's harvest was delayed and much of the crop was lost. Norton's equipment sustained damage, and Norton had to hire security guards.

### CONTENTIONS ON APPEAL

On appeal, Local argues first that the trial court erred in instructing on the negligent supervision cause of action because it gave conflicting instructions. It created an irreconcilable conflict in instructions when the court instructed on common law agency principles and the preponderance-of-evidence standard when it should have instructed only in the language of section 6 of the Norris-LaGuardia Act. Appellant contends that the federal statute has in fact preempted certain state common law principles of agency liability, and since section 6 was not applied consistently to all allegations against Local, the judgment finding Local liable for negligent supervision and awarding compensatory and punitive damages should be reversed.

Secondly, Local contends that the court erred in excluding evidence that was relevant on the issue of Local's exposure to punitive damages. Despite complaining of these errors, however, appellant has waived them as a basis for a reversal of the punitive damages award. Consequently, we deem this issue to be moot.

Finally, appellant asserts that under California common law principles, the award of punitive damages against the Local should be reversed on the ground of insufficiency of proof of malice and oppression as a matter of law.

### I. *Preemption*

Local contends that section 6 preempts state-agency-liability and preponderance-of-evidence standards, and argues that only the clear proof instruction should have been given.

The court instructed the jury on negligence (BAJI Nos. 3.10 and 3.11),[4] the theories of liability (agency and respondeat superior),[5] and the standards

---

[4]BAJI No. 3.10 provides: "Negligence is the doing of something which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do, under circumstances similar to those shown by the evidence. [¶] It is the failure to use ordinary or reasonable care. [¶] Ordinary or reasonable care is that care which persons of ordinary prudence would use in order to avoid injury to themselves or others under circumstances similar to those shown by the evidence. [¶] [You will note that the person whose conduct we set up as a standard is not the extraordinarily cautious individual, nor the exceptionally skillful one, but a person of reasonable and ordinary prudence.]"

BAJI No. 3.11 provides: "One test that is helpful in determining whether or not a person was negligent is to ask and answer whether or not, if a person of ordinary prudence had been in the same situation and possessed of the same knowledge, he would have foreseen or anticipated that someone might have been [damaged] by or as a result of his action or inaction. If the answer to that question is 'yes', and if the action or inaction reasonably could have been avoided, then not to avoid it would be negligence."

Plaintiff's special instruction No. 10 read: "The officers of a labor union are employees of that union."

[5]The court instructed in the language of BAJI No. 13.00, modified: "One is the agent of another person at a given time if he is authorized to act for or in place of such person or if his acts are later ratified by such person. One may be an agent although he receives no payment for his services. For the purposes of this trial, the term 'agent' includes employees and the term 'principal' includes employers."

BAJI No. 13.01 provided: "It is not necessary that a particular act or failure to act be expressly authorized by the principal to bring it within the scope of the agent's authority or employment. Such conduct is within the scope of his authority or employment if it occurs while the agent is engaged in the duties which he was employed to perform and relates to those duties. Conduct for the benefit of the principal which is incidental to, customarily connected with or reasonably necessary for the performance of an authorized act is within the scope of the agent's authority or employment."

Plaintiff's modified BAJI No. 13.30 read: "International Brotherhood of Teamsters and Local 890 are unincorporated associations. As such they can act only through their officers and employees. Any act or omission of an officer or employee of Local 890, within the scope of his authority or employment, is in law the act or omission of Local 890. Any act or omission of an officer or employee of the International, within the scope of his authority or employment, is in law the act or omission of the International."

Plaintiff's modified BAJI Nos. 13.06 and 13.07 read: "Defendants International Brotherhood of Teamsters ("International') and Local 890 are also being sued under the theory of *respondeat superior,* that is, the doctrine that the principal is liable for all acts of his agent or employee committed within the scope of his agency or employment. [¶] If you find that the International and Local 890, employees or agents for the International, Local 890, or both, were acting within the scope of employment when engaging in any of the wrongful acts alleged, then you must hold the principal (the International and/or Local 890) liable for those wrongful acts. This is true whether you find that the individuals actually committed the wrongful acts or conspired to commit the wrongful acts. [¶] If you find that Local 890, itself, acted as the agent of the International, and within the scope of its authority committed or conspired to commit any of the wrongful acts alleged, then you must hold the International liable for those wrongful acts. [¶] However, if you find that no employee or agent of either the International or Local 890, acting within the scope of his authority, committed or conspired to commit any of the wrongful acts alleged, then you must not find liability under the doctrine of *respondeat superior.*"

of proof to be applied (preponderance of evidence and clear and convincing evidence).[6]

The Norris-LaGuardia Act, 29 United States Code Annotated sections 101-115, was enacted in 1932. Behind section 6, "[t]he driving force . . . was the fear that unions might be destroyed if they could be held liable for damage done by acts beyond their practical control." (*Mine Workers* v. *Gibbs* (1966) 383 U.S. 715, 736-737 [16 L.Ed.2d 218, 234, 86 S.Ct. 1130].) Section 6 by its terms applied to actions in the federal courts, and was held to apply to state tort claims being heard in the federal courts. (*Ibid.*)

Congress did not intend to shield unions from all liability for wrongdoing. "On its face, § 6 . . . is concerned only with requiring 'clear proof' that the person or organization charged actually participated in . . . 'such acts.' Nothing . . . suggests that a new and different standard of proof was being prescribed for all issues in actions against a union . . . involved in a labor dispute. . . . [¶] . . . We find no support in the legislative material that Congress intended broadly to modify the standard of proof where union and employer are sued separately or together in civil actions for damages incurred in the course of labor disputes." (*Ramsey* v. *Mine Workers* (1971) 401 U.S. 302, 309-310 [28 L.Ed.2d 64, 70, 91 S.Ct. 658].) In enacting the National Management Relations Act in 1947, 29 United States Code section 141 et seq., Congress referred to ordinary agency standards for "the responsibility of a union for the acts of its members and officers . . . rather than the more stringent standards of § 6." (*Gibbs, supra,* 383 U.S. at p. 736 [16 L.Ed.2d at p. 234].)

---

[6] The preponderance-of-the-evidence instruction read: "Except as you will be otherwise instructed, the Plaintiff has the burden of establishing by a preponderance of the evidence the facts necessary to prove all of the issues on which you have been instructed. [¶] By a preponderance of the evidence is meant such evidence as, when weighed with that opposed to it, has more convincing force and the greater probability of truth. In the event that the evidence is evenly balanced so that you are unable to say that the evidence on either side of an issue preponderates, then your finding upon that issue must be against the party who had the burden of proving it. [¶] In determining whether an issue has been proved by a preponderance of the evidence, you should consider all of the evidence bearing upon that issue regardless of who produced it."

Appellant's instruction A read: "No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof. [¶] [Citations] [¶] Clear proof means clear and convincing proof. Plaintiff is not required to meet the criminal standard of beyond a reasonable doubt. But, Plaintiff may not prevail by meeting the ordinary civil standard of a preponderance of the evidence. [¶] To prove ratification of unlawful acts Plaintiff must prove that the union approved the violence which occurred, or that it participated actively or by knowing tolerance in further acts which were in themselves actionable under the State law or intentionally drew upon the previous violence for their force."

Congress "neither provided nor suggested any substitute for the traditional state court procedure for collecting damages for injuries caused by tortious conduct. For us to cut off the injured respondent from this right of recovery will deprive it of its property without recourse or compensation. To do so will, in effect, grant petitioners immunity from liability for their tortious conduct. We see no substantial reason for reaching such a result." (*United Workers* v. *Laburnum Corp.* (1954) 347 U.S. 656, 663-664 [98 L.Ed. 1025, 1031, 74 S.Ct. 833].)

It is true that remedies for wrongdoing in labor disputes vary. "[T]o the extent that widely disparate remedies theoretically remain available in state, as opposed to federal, courts, the federal policy of labor law uniformity . . . is seriously offended . . . for undoubtedly a certain diversity exists among the state and federal systems in matters of procedural and remedial detail, a fact that Congress evidently took into account in deciding not to disturb the traditional jurisdiction of the States." (*Boys Markets* v. *Clerks Union* (1970) 398 U.S. 235, 245-246 [26 L.Ed.2d 199, 207, 90 S.Ct. 1583].)

The United States Supreme Court has long recognized the power of the state courts to award damages under state tort law for violent conduct. "We have held that the state still may exercise 'its historic powers over such traditionally local matters as public safety and order and the use of streets and highways.' [Citation.]" (*Garner* v. *Teamsters Union* (1953) 346 U.S. 485, 488 [98 L.Ed. 228, 238, 74 S.Ct. 161].) "[T]here is no ground for concluding that existing criminal penalties or liability for tortious conduct have been eliminated." (*Laburnum Corp., supra,* 347 U.S. at p. 665 [98 L.Ed. at p. 1031].) " '[W]e have allowed the States to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order. [Citations.] . . . State jurisdiction has prevailed in these situations because the compelling state interest . . . is not overridden in the absence of clearly expressed congressional direction.' [Citation.]" (*Gibbs, supra,* 383 U.S. at p. 721 [16 L.Ed.2d at p. 225].)

The issue of whether this standard should be applied by state courts to state tort claims in its courts has occupied considerable judicial energy.

Kansas, Michigan, Louisiana, Connecticut, Florida, and New Mexico courts have found that section 6 applies to tort claims in state courts.[7]

---

[7] *Heistand* v. *Amalgamated Meatcutters, etc.* (1983) 233 Kan. 759 [666 P.2d 671]; *Sowels* v. *Laborers' Intern. Union of N. Am.* (1981) 112 Mich.App. 616 [317 N.W.2d 195]; *Melancon* v. *United Ass'n of Journeymen* (La.App. 1980) 386 So.2d 669, writ refused June 13, 1980, 387 So.2d 596; *International U. of Operating Engineers* v. *Long* (Fla.Dist.Ct.App. 1978) 362 So.2d 987; *United Aircraft Corp.* v. *International Ass'n of Mach.* (1971) 161 Conn. 79 [285 A.2d 330] interpreting Connecticut statute similar to section 6, certiorari denied January 10,

Arizona, North Carolina, and Washington courts determined that state agency rules, and not the more stringent federal rule, apply in their states.[8] Washington is unique in that its legislature enacted a statute patterned after section 6 but did not apply it to state tort actions.[9]

The California Supreme Court, in *McCarroll* v. *L. A. County etc. Carpenters* (1957) 49 Cal.2d 45, 63 [315 P.2d 322], held that the Norris LaGuardia Act did not limit the remedial power of the state courts.[10] Although *McCarroll* was concerned with injunctive relief, California courts, like federal courts, have held that the state is not precluded from regulating tortious conduct even if it arises in the context of labor disputes. In *M Restaurants, Inc.* v. *San Francisco Local Joint Exec. Bd. Culinary etc. Union* (1981) 124 Cal.App.3d 666, 678-679 [177 Cal.Rptr. 690], the court said, "where the regulated ' "conduct touch[es] interests so deeply rooted in local feeling and responsibility . . .," ' the federal labor policy will not be construed to preclude the states from regulating aspects of labor relations that involve such conduct. 'Policing of actual or threatened violence to persons or destruction of property has been held most clearly a matter for the States.' [Citations.]"

Appellant urges the court to apply the strict federal standard in state tort cases on the ground that California follows federal labor law in many respects and that California labor policy and federal labor policy are identical.

California has indeed acted to adopt federal labor law in part. In 1975, the Legislature enacted the Agricultural Labor Relations Act, Labor Code section 1140 et seq., based on the National Labor Relations Act (29

1972, 404 U.S. 1016 [30 L.Ed.2d 663, 92 S.Ct. 675]; *Gonzales* v. *Oil, Chemical and Atomic Workers Int. U.* (1966) 77 N.M. 61 [419 P.2d 257].

[8] *R. H. Bouligny, Inc.* v. *United Steelworkers of Amer.* (1967) 270 N.C. 160 [154 S.E.2d 344]; *Carter-Glogau Labs* v. *Const. Lab. Local 383* (1986) 153 Ariz. 351 [736 P.2d 1163].

[9] In *Buchanan* v. *Intern. Bro. of Teamsters, etc.* (1980) 94 Wn.2d 508 [617 P.2d 1004], in holding that this statute was not applicable to state tort actions for damages, the court relied on a pre-*Gibbs* ruling in the case of *Titus* v. *Tacoma Smeltermen's Union Local #25* (1963) 62 Wn.2d 461 [383 P.2d 504]. The *Titus* court held that the statute should not apply to tort cases because the title of the act in which the statute appeared was limited to restraining orders. The *Buchanan* court acknowledged the *Gibbs* ruling three years after *Titus,* but declined to follow it in interpreting the state statute, because of the failure of the Washington Legislature, which had met 22 times after the *Gibbs* case, to amend the statute. *Buchanan* interpreted the Legislature's silence as concurrence in the *Titus* result and disapproval of *Gibbs.* (*Buchanan, supra,* at pp. 1005-1006.)

[10] Any doubts as to the validity of the *McCarroll* ruling were laid to rest by the United States Supreme Court, which said approvingly in *Boys Markets, supra,* 398 U.S. at p. 247 [26 L.Ed.2d at p. 208]: "we agree with Chief Justice Traynor of the California Supreme Court that 'whether or not Congress could deprive state courts of the power to give such [injunctive] remedies when enforcing collective bargaining agreements, it has not attempted to do so . . . in the Norris-LaGuardia Act . . . .' [Citations.]"

U.S.C.A. § 151 et seq.). California also adopted section 4 of the Norris-LaGuardia Act (29 U.S.C.A. § 104) as the Moscone Act, Code of Civil Procedure section 527.3. Section 527.3 limited the ex parte injunctive relief that could be granted by the court.

Interestingly enough, the Legislature did not enact the provisions of section 6, although the declared public policy was stated in edited but almost identical language[11] to the policy statement of Congress in the Norris-LaGuardia Act (29 U.S.C.A. § 102).

This choice on the part of the Legislature cannot be considered to be inadvertent. ■ The omission of a provision contained in a foreign statute providing the model for action by the Legislature is a strong indication that the Legislature did not intend to import such provision into the state statute. (73 Am.Jur.2d, Statutes, § 334, pp. 477-478.) ■ In fact, the California Supreme Court has declared that the Legislature intended the courts to continue to follow principles of California law extant at the time of the enactment of the statute. The Legislature did not intend for the courts to abandon such principles in favor of federal rules which rest on a statutory and administrative basis foreign to California law. (*Sears, Roebuck & Co.* v. *San Diego County Dist. Council of Carpenters* (1979) 25 Cal.3d 317 [158 Cal.Rptr. 370, 599 P.2d 676]; see also *Watson* v. *Superior Court* (1972) 24 Cal.App.3d 53, 60 [100 Cal.Rptr. 684], superseded on another point by Code Civ. Proc., § 581; *Theodor* v. *Superior Court* (1972) 8 Cal.3d 77, 92 [104 Cal.Rptr. 226, 501 P.2d 234].)

■ "It is a prime rule of construction that the legislative intent underlying a statute must be ascertained from its language; if the language is clear, there can be no room for interpretation, and effect must be given to its plain

[11] Statutes 1975, chapter 1156, section 1 provides: "In the interpretation and application of this act the public policy of this state is declared as follows: [¶] Under prevailing economic conditions the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor and thereby to obtain acceptable terms and conditions of employment. It is therefore necessary that he have full freedom of association and self-organization and the right to engage in concerted activities for the purpose of collective bargaining, picketing or other mutual aid or protection . . . ."

29 United States Code Annotated section 102 declares: "Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; . . ."

meaning. [Citations.] 'An intent that finds no expression in the words of the statute cannot be found to exist. The courts may not speculate that the legislature meant something other than what it said. Nor may they rewrite a statute to make it express an intention not expressed therein.' (Fns. omitted.) [Citation.]" (*Hennigan* v. *United Pacific Ins. Co.* (1975) 53 Cal.App.3d 1, 7 [125 Cal.Rptr. 408].)

The Arizona court, in *Carter-Blogau Labs, supra,* 736 P.2d. at page 1167, used just this reasoning in concluding that section 6 did not apply to its courts: "The fact that Norris-LaGuardia was in existence at the time of the drafting and passage by referendum of Arizona's 'right to work' legislation . . . convinces us that the people of this state deliberately chose not to adopt the more stringent standard of proof."

We agree, and find, accordingly, that the provisions of section 6 do not preempt California law. The instruction was erroneously given.

A union's responsibility for the acts of its agents is well established in California. A labor union is an unincorporated association. An unincorporated association is liable for its own torts as if the association were a natural person. An unincorporated association acts through its officers, agents, or employees. When they are acting within the scope of their office, agency, or employment, their actions bind the association. (Corp. Code, § 24000 et seq.; *Marshall* v. *International Longshoremen's & Warehousemen's Union* (1962) 57 Cal.2d 781 [22 Cal.Rptr. 211, 371 P.2d 987]; *Inglis* v. *Operating Engineers Local Union No. 12* (1962) 58 Cal.2d 269 [23 Cal.Rptr. 403, 373 P.2d 467]; *Coats* v. *Construction & Gen. Laborers Local No. 185* (1971) 15 Cal.App.3d 908 [93 Cal.Rptr. 639].)

Local's liability is clear. Notwithstanding the instructional error, appellant was not harmed. Local received the benefit of having the jury instructed on the more stringent provisions of section 6, and a more favorable outcome was not likely to result if those instructions had not been given. (*Vasquez* v. *Alameda* (1958) 49 Cal.2d 674, 677 [321 P.2d 1].)

## II. *Punitive Damages*

Local attacks the jury's award of punitive damages, claiming that the evidence was insufficient as a matter of law to support the necessary finding of malice or oppression. Local concedes that given the various verdicts against the various defendants, the award of punitive damages against the union was based solely on negligent supervision coupled with a finding of malice or oppression and extreme indifference to the rights of Norton on the part of Local's managerial employees. Local further concurs that the jury had to have found that these employees acted with knowledge

of the probable dangerous consequences of the strike, and deliberately failed to avoid them.

■ "[I]n reviewing an award of punitive damages, this court applies the substantial evidence test, reviewing the record in a light most favorable to the judgment. [Citations.] . . . [s]ubstantial evidence is not synonymous with 'any' evidence. Substantial evidence is evidence which is reasonable in nature, credible, and of solid value; it must be of 'ponderable legal significance.' [Citation.]" (*Travelers Ins. Co.* v. *Lesher* (1986) 187 Cal.App.3d 169, 200-201 [231 Cal.Rptr. 791].)

" '[A]ll conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible' . . . and . . . when two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the jury. [Citations.] . . . '[W]e have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom,' [citation] . . . [because] the jury is to find not only the facts but the inferences from them, if any may properly be drawn." (*Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 696-697 [39 Cal.Rptr. 64].)

■ Within the meaning of Civil Code section 3294 (allowing recovery of punitive damages where defendant was guilty of oppression or malice), "malice" means a wrongful intent to vex or annoy; "oppression" means subjecting a person to cruel and unjust hardship in conscious disregard of his rights. Malice and oppression may be inferred from the circumstances of a defendant's conduct. (*Monge* v. *Superior Court* (1986) 176 Cal.App.3d 503 [222 Cal.Rptr. 64].) Evidence establishing "conscious disregard of another's rights" is evidence indicating that the defendant was aware of the probable consequences of his or her acts and willfully and deliberately failed to avoid those consequences. (*Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 896 [157 Cal.Rptr. 693, 598 P.2d 854]; *Travelers Ins. Co., supra,* 187 Cal.App.3d at p. 200.)

■ Local's knowledge of and failure to avoid undue consequences were established by evidence that on the first day of the strike, the arrested striker and negotiating team member asked to be returned to the union hall; he was represented by the union's attorney and the union paid his fine. The next day, the union received the temporary restraining order obtained by Norton, but Local's lawyer passed out a copy or two in English to the strikers (some of whom were Spanish-speaking), told them to limit the number of pickets, and apparently did not herself, nor arrange for anyone else to, make

its provisions clear to the pickets. Norton sent Mailgrams six days apart, on October 5 and October 11, complaining of the continuing violence. Local's president did not believe the claims and failed to investigate. The business agent asked a group of strikers if they had engaged in misconduct and was satisfied by their denials; however, he didn't know whom he had talked to nor how often he visited the picket line; he recalled his conversation as "keeping up [their] morales." The arrested striker, who was on the line almost every day, said he saw the business agent fewer than three times. Local never selected picket captains nor monitored the strikers' conduct.

■ If an employer, after knowledge or opportunity to learn of his agent's misconduct, retains the wrongdoer in service, the employer may be liable in punitive damages for the misconduct. (*Coats, supra,* 15 Cal.App.3d 908.) ■ As in *Coats,* Local's officers were personally involved in the misconduct, and the Local did not relieve them of their duties when it learned of their wrongdoing. ■ A corporation may be held liable for punitive damages for the acts of its agents and employees when the act is motivated by actual malice or done under circumstances amounting to oppression, providing that the act is done with the knowledge or under the direction of corporate officials having power to bind the corporation. (*Toole v. Richardson-Merrell Inc.* (1967) 251 Cal.App.2d 689 [60 Cal.Rptr. 398, 29 A.L.R.3d 988].) ■ Local, an unincorporated association, may be held liable for punitive damages in the same circumstances.

The evidence is clearly sufficient to find that the acts were done with the knowledge of officials having power to bind Local, that the acts were done under circumstances amounting to oppression, and that Local acted in conscious disregard of Norton's rights.

### DISPOSITION

The judgment is affirmed.

Agliano, P. J., and Brauer, J., concurred.

Respondent's petition for review by the Supreme Court was denied May 18, 1989. Mosk, J., was of the opinion that the petition should be granted.