[No. A067972. First Dist., Div. Two. Jan. 2, 1996.]

HILLHAVEN OAKLAND NURSING AND REHABILITATION
CENTER, Plaintiff and Respondent, v.
HEALTH CARE WORKERS UNION, LOCAL 250, AFL-CIO, et al.,
Defendants and Appellants.

## COUNSEL

William A. Sokol for Defendants and Appellants.

Jackson, Lewis, Schnitzler & Krupman, Harry G. Lewis, Bradley W. Kampas and Keith M. Sherman for Plaintiff and Respondent.

## OPINION

### KLINE, P. J.—

#### INTRODUCTION

During the course of a labor dispute, respondent Hillhaven Oakland Nursing and Rehabilitation Center (Hillhaven) sought and obtained a preliminary injunction against appellant Health Care Workers Union, Local 250, AFL-CIO (Local 250) restricting the number of union representatives who might enter Hillhaven's Webster Street facility at any time and regulating the place and manner in which Local 250 representatives might speak with employees or others both in and outside the facility. Specifically, Local 250 representatives were restrained from:

"(a) Having more than two (2) representatives in the facility at 3030 Webster Street, Oakland, California at any time;

"(b) Conducting Union business or speaking with employees or other persons about Union business in the presence of or within hearing distance of any resident(s);

"(c) Entering resident personal rooms at any time and entering any area used for the purpose of resident therapy or recreational activities while residents are present; or

"(d) Speaking or carrying on conversation(s) inside or outside the facility which, due to its unreasonable tone or noise level, disturbs, annoys or bothers residents; or in any other way disturbing the peace inside the facility."

Local 250 appeals, contending the National Labor Relations Act, 29 United States Code section 151 et seq., preempts the state court's jurisdiction to issue such an injunction. If preemption is not found, appellant argues the injunction is overbroad and vague so as to unconstitutionally restrain freedom of speech.

#### FACTUAL AND PROCEDURAL BACKGROUND

Respondent Hillhaven is a corporation which operates a convalescent and nursing home facility in Oakland, California. Appellant Local 250 is the certified bargaining representative of employees at Hillhaven. On July 28, 1994, Local 250 and Hillhaven were in the process of negotiating for a

successor master collective bargaining agreement as the then current agreement was due to expire on December 1, 1994.[1]

On July 28, 1994, at approximately 2 p.m., a group of approximately 25 to 30 representatives and agents of Local 250 entered the nursing home through the facility's back door. They began to distribute flyers to employees, residents and their families and spread throughout the facility to meet with employees. These meetings were described as "noisy" and "disruptive" in declarations filed by various Hillhaven supervisorial personnel in support of Hillhaven's ex parte application for a temporary restraining order.

One of the group informed the director of nursing that they were union representatives who wanted to see the building.

As they dispersed through the building, the following actions were observed by Hillhaven supervisors:

In the kitchen area, the director of nutritional services heard a "lot of noise" from the middle of the kitchen and saw approximately six representatives talking to members of the dietary staff. While doing so, the representatives held the kitchen door open, in violation of a state law requiring the kitchen door remain closed at all times except for food services purposes. Upon the appearance of the director, four of the representatives left quickly and joined a larger group of people walking by the hallway. This group of approximately 20 people filled the entire corridor and "were being disruptive to the facility because of their talking and shuffling." (Declaration of Gordon Parberry, director of nutritional services.)

Rehabilitation director Deirdre O'Bryan noticed from 10 to 15 people walking around the hall across from the occupational therapy room blocking and clogging the hallways. The group walked from the north nurses station toward the south nurses station, spread across the width of the hallway approximately 10 feet deep. The group was loud and disruptive to the delivery of patient care at the time, because many of them were looking into rooms of the facility, including the therapy room, causing O'Bryan and others to stop what they were doing. At this point O'Bryan went to assist a patient reposition his chair in the south dining room, and she noticed four or five representatives "staring glaringly at us while myself [and three other employees] delivered care to one of the residents. This was very upsetting because I felt they were scrutinizing us."

---

[1]Hillhaven contends, without citation to the record that "[t]he most recent collective bargaining agreement expired on September 14, 1994 and was extended until January 31, 1995." This disagreement as to expiration date has no effect on the issues or analysis herein.

For approximately five minutes, one of the union representatives walked down the hall taking pictures of staff and residents. Thereafter, one of the residents was very upset because she was afraid they might have taken pictures of her. Another visibly frightened and upset resident came to the office manager three times during the hours after the incident and told her " 'these people are going to shoot me.' " (Declaration of office manager Nancy Sidrer.)

Approximately five union representatives were seen talking to four staff members in the south dining room, which is for use by residents and their families only. Three representatives were seen leaving literature on a table in the occupational therapy department, which is a restricted area to the union and other outsiders. (Declaration of director of occupational therapy Gloria Canlas.)

The large group walking throughout the facility disturbed residents, who seemed surprised at such a large group of people walking around. Union representatives were heard asking residents whether the CNA's (certified nursing assistants) were taking good care of them. (Declaration of Magdalena Kubalska, resident care coordinator.)

During one resident's speech therapy, a female union member entered the resident's room without knocking, placed a flyer on the table between the resident and his treating therapist and told the resident and the therapist to read the flyer. Other than employees and designated visitors, nonrelatives are not allowed in resident's rooms without permission. The incident was "highly disruptive" to the resident's therapy because the resident was highly distractible and was unable to complete his therapy after the woman left. The noise made by the group walking throughout the facility's halls was also disruptive to this resident, making him unable to focus on the tasks before him. (Declaration of Lisa De Armond, director of speech pathology.)

At approximately 2:30 p.m., a large group gathered "outside in front of the building on the sidewalk chanting, yelling, waving their arms and cheering." A resident standing near the front door was very upset and asked "whether the Union was going to shoot her." (Declaration of Karen Ansell, director of nursing.)

As summarized by Hillhaven facility administrator Cherese Holland, many patients were confused and frightened by the noise and remained upset for hours after the demonstration. The demonstrators refused to leave the building until they were ordered out by the police.

Hillhaven is strictly regulated by federal regulations, as well as state health and safety regulations. Noise levels in the building and hallway

accessibility are strictly regulated to ensure resident comfort and safety.[2] Hallways are only eight feet wide. Residents in wheelchairs often sit in the hallway to socialize and residents walk with the help of an aide through the hallway for exercise. Medicine carts must be kept in hallways during rounds.

The following day, Hillhaven filed a complaint for injunction and damages based upon the foregoing conduct and sought a temporary restraining order (TRO). The TRO issued later that same day.

On September 8, 1994, a hearing was held on the "Order to Show Cause for the Preliminary Injunction." Thereafter, on September 16, 1994, the superior court issued a preliminary injunction. On November 4, 1994, Local 250 filed its answer to Hillhaven's complaint for injunction and damages. On November 17, 1994, Local 250 filed the instant appeal of the grant of the preliminary injunction.

Meanwhile, on August 19, 1994, after obtaining the TRO, but before the hearing on the preliminary injunction, Hillhaven filed a charge against Local 250 with the National Labor Relations Board (NLRB), based upon the July 28th incident. This charge alleged "Within the past six months, [Local 250], has restrained, coerced and intimidated employees in the exercise of the rights guaranteed in Section 7 and has restrained, coerced and intimidated an employer in the selection of its representati[ves] for the purposes of collective bargaining."[3] Following its investigation and determination that the charge had merit, the regional director issued a "Complaint and Notice of Hearing" on September 26, 1994.[4]

---

[2]The State of California had previously notified Hillhaven of excessive noise in the lobby area. This deficiency was caused by normal staff conversation in the corridors. Excessive noise could jeopardize the facility's state license.

[3]At Local 250's request, we have taken judicial notice of this charge (case No. 32-CB-4352), of the "Complaint and Notice of Hearing" issued thereupon, the resulting settlement agreement and related documents.

[4]The complaint issued by the regional director alleged as follows:

"7

"(a) On or about July 28, 1994, [Local 250] invaded the Employer's Oakland, California facility without permission and roamed the facility leafletting and talking to employees and residents until dispersed by police, notwithstanding the facility administrator's repeated demands that they leave.

"(b) The conduct described [above] took place during regular business hours while employees were present, in patient care areas, and interfered with and disrupted the normal operations of the Employer's Oakland, California facility.

"8

"By the acts and conduct described above in paragraph 7, and by each of said acts, Respondent has restrained and coerced, and is restraining and coercing, employees in the

Thereafter, the matter was settled.[5] Local 250 agreed that its members "will not intentionally interfere with or disrupt the normal operation" of Hillhaven's Oakland facility "by, without permission, entering the facility and roaming about, leafletting, chatting with employees in patient areas and talking to patients. [This does not preclude lawful picketing outside the facility in connection with a labor dispute nor does it preclude normal practice, as permitted by the contract, regarding servicing of the collective bargaining agreement.]" (Settlement agreement and notice to members.) The agreement also required the union to post a notice to this effect at the union hall and at the employer's place of business for 60 days. The union complied with all provisions of the settlement agreement, and the case was closed as an active compliance matter; however, provisions of the agreement remain in effect regardless of the closing of the NLRB case.

The superior court civil action was stayed pending the outcome of this appeal.

## DISCUSSION

The parties agree that we review de novo whether this state court action is preempted by federal law. (See *California Arco Distributors, Inc.* v. *Atlantic Richfield Co.* (1984) 158 Cal.App.3d 349 [204 Cal.Rptr. 743].)

## I.

In *San Diego Unions* v. *Garmon* (1959) 359 U.S. 236 [3 L.Ed.2d 775, 79 S.Ct. 773], the United States Supreme Court established general guidelines for determining the permissible scope of state regulation of activity touching upon labor-management relations, holding that when an activity is actually or arguably prohibited or actually or arguably protected by section 7 or section 8 of the National Labor Relations Act (NLRA) (29 U.S.C. § 151 et seq.), state courts must defer to the exclusive competence of the NLRB in order to avoid state interference with national labor policy. (359 U.S. at p.

exercise of their rights under Section 7 of the Act, and Respondent thereby has been engaging in unfair labor practices affecting commerce within the meaning of Section 8(b)(1)(A) and Section 2(6) and (7) of the Act."

[5]The regional director, acting as the representative of the general counsel of the board, unilaterally settled its complaint against Local 250. No findings were made on the complaint, and the union did not admit to having violated any provisions of the National Labor Relations Act. The settlement agreement recited that it "resolves only those allegations raised in Case 32-CB-4352, and no other allegations, and is not intended to settle, resolve, dispose of or preclude litigation on any other matter, regardless of whether such other matter is now known or unknown to the General Counsel, or whether such other matter is or is not now pending before the National Labor Relations Board."

245 [3 L.Ed.2d at p. 783]; see *Kelecheva* v. *Multivision Cable T.V. Corp.* (1993) 18 Cal.App.4th 521, 527-528 [22 Cal.Rptr.2d 453].)[6]

However, the court has refused to apply the *Garmon* guidelines in a literal, mechanical fashion. (*Sears, Roebuck & Co.* v. *Carpenters* (1978) 436 U.S. 180, 188 [56 L.Ed.2d 209, 219-220, 98 S.Ct. 1745].) The Supreme Court has recognized as an exception to the general rule of preemption the power of state courts "to enforce certain laws of general applicability even though aspects of the challenged conduct are arguably prohibited by § 8 of the NLRA. Thus, for example, the Court has upheld state-court jurisdiction over conduct that touches 'interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act.' " (*Sears, Roebuck & Co.* v. *Carpenters, supra,* at pp. 194-195 [56 L.Ed.2d at pp. 223-224], quoting *San Diego Unions* v. *Garmon, supra,* 359 U.S. at p. 244 [3 L.Ed.2d at pp. 782-783].) The local interest exception was founded upon the "compelling state interest . . . in the maintenance of domestic peace" and applied to "conduct marked by violence and imminent threats to the public order." (*San Diego Unions* v. *Garmon, supra,* 359 U.S. at p. 247 [3 L.Ed.2d at p. 784].) "Since *Garmon* the exception has been extended to conduct defined as tortious by state law which involves neither violence or other threat to the 'maintenance of domestic peace.' " (18A Kheel, Business Organizations (1989) § 9.05[4], p. 9-132.)

Traditionally conduct falling within the "local interest" exception to preemption has included violence (*Youngdahl* v. *Rainfair, Inc.* (1957) 355 U.S. 131 [2 L.Ed.2d 151, 78 S.Ct. 206]; *Auto Workers* v. *Wisconsin Board* (1956) 351 U.S. 266 [100 L.Ed. 1162, 76 S.Ct. 794]); threats of violence (*United Workers* v. *Laburnum Corp.* (1954) 347 U.S. 656 [98 L.Ed. 1025, 74 S.Ct. 833]; libel (*Linn* v. *Plant Guard Workers* (1966) 383 U.S. 53 [15 L.Ed.2d 582, 86 S.Ct. 657]); infliction of emotional distress (*Farmer* v. *Carpenters* (1977) 430 U.S. 290 [51 L.Ed.2d 338, 97 S.Ct. 1056]); trespass (*Sears, Roebuck & Co.* v. *Carpenters, supra,* 436 U.S. 180); obstructions of access to property (*Youngdahl* v. *Rainfair, Inc., supra,* 355 U.S. 131; *Auto Workers* v. *Wisconsin Board, supra,* 351 U.S. 266); and state breach of contract actions by laid-off replacement employees. (*Belknap, Inc.* v. *Hale* (1983) 463 U.S.

---

[6]Neither party contends that Local 250's conduct in this instance was "arguably protected" under the NLRA.

A second preemption doctrine commonly referred to as *"Machinists* preemption" after *Machinists* v. *Wisconsin Emp. Rel. Comm'n* (1976) 427 U.S. 132 [49 L.Ed.2d 396, 96 S.Ct. 2548], protects against state interference with policies implicated by the structure of the NLRA itself, by preempting state law and state causes of action concerning conduct that Congress intended to remain unregulated. This doctrine is not here at issue.

491 [77 L.Ed.2d 798, 103 S.Ct. 3172]; see *Kaplan's Fruit & Produce Co.* v. *Superior Court* (1979) 26 Cal.3d 60, 69-70 [160 Cal.Rptr. 745, 603 P.2d 1341].)

Cases following *Garmon* have clarified that the preemption issue as to both arguably prohibited and arguably protected conduct "turns primarily on whether preemption is necessary to avoid conflicting adjudications which would interfere with the regulatory activity of the administrative board. (See *Sears, Roebuck & Co.* v. *Carpenters, supra,* 436 U.S. 180, 197 . . . ; *Farmer* v. *Carpenters, supra,* 430 U.S. 290, 305 [51 L.Ed.2d 338, 353]; *Motor Coach Employees* v. *Lockridge* (1971) 403 U.S. 274, 285 . . . .)" (*Kaplan's Fruit & Produce Co.* v. *Superior Court, supra,* 26 Cal.3d 60, 69-70.)

In *Sears, Roebuck & Co.* v. *Carpenters, supra,* 436 U.S. 180, the court expanded the local interest exception to a case involving peaceful, nonobstructive picketing on an employer's private property. The Supreme Court held that although the picketing was both arguably protected and arguably prohibited under the NLRA, the state was not preempted from applying its trespass laws to the disputed conduct and enjoining the trespass.

In so doing, the *Sears* court identified factors warranting a departure from *Garmon* general preemption guidelines in local interest cases, finding two relevant to the arguably *prohibited* branch of the *Garmon* doctrine: "First, there existed a significant state interest in protecting the citizen from the challenged conduct. Second, although the challenged conduct occurred in the course of a labor dispute and an unfair labor practice charge could have been filed, the exercise of state jurisdiction over the tort claim entailed little risk of interference with the regulatory jurisdiction of the labor board. Although the arguable federal violation and the state tort arose in the same factual setting, the respective controversies presented to the state and federal forums would not have been the same." (*Sears, Roebuck & Co.* v. *Carpenters, supra,* 436 U.S. at pp. 196-197 [56 L.Ed.2d at p. 224-225].)

 Where arguably prohibited conduct is at issue, the court framed the preemption analysis as follows: "The critical inquiry, therefore, is not whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the controversy presented to the state court *is identical to . . . or different from . . .* that which could have been, but was not, presented to the Labor Board. For it is only in the former situation that a state court's exercise of jurisdiction necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board which the arguably prohibited branch of the *Garmon* doctrine was designed

to avoid." (*Sears, Roebuck & Co.* v. *Carpenters, supra,* 436 U.S. 180, 197 [56 L.Ed.2d 209, 225-226], italics added.)

Applying this rationale, the court found that plaintiff Sears would not have presented the same controversy to the board as it did in state court. The federal issue would have focused upon whether the picketing had an unlawful recognition or work assignment objective. The trespass issue, which involved only the *location* of the picketing, was not related to the federal issues to be resolved. (436 U.S. at p. 198 [56 L.Ed.2d at p. 226].) Consequently, permitting the trespass action to go forward created "no realistic risk of interference with the Labor Board's primary jurisdiction to enforce the statutory prohibition against unfair labor practices." (*Ibid.*)[7]

*Sears* was distinguished in *Operating Engineers* v. *Jones* (1983) 460 U.S. 669 [75 L.Ed.2d 368, 103 S.Ct. 1453], where it was claimed that a union had engaged in prohibited conduct by procuring Jones's discharge by a company from his position as a supervisor because he was not a member in good standing of the union. It was conceded that the state cause of action was preempted to the extent it covered coercive influence on the employer. (*Id.* at p. 682 [75 L.Ed.2d at pp. 379-380].) The court rejected Jones's argument that his state court action for noncoercive interference with contractual relationships should be allowed to proceed because it was not *identical* to the issue which could be raised before the board. The court reasoned that "*a fundamental part* of such a claim is that the Union actually caused the discharge and hence was responsible for the employer's breach of contract. Of course, this *same crucial element must be proved* to make out a § 8(b)(1)(B) case: the discharge must be shown to be the result of Union influence. Even on Jones's view of the elements of his state-law cause of action, the federal and state claims are thus *the same in a fundamental respect* . . . ." (*Ibid.,* italics added.) The same issue of causation would have been presented for decision in both forums and would have been "*at the core*" of an unfair labor practice claim. (*Id.* at p. 683 [75 L.Ed.2d at p. 380], italics added.)

---

[7]Similarly, the California Supreme Court has upheld a state court injunction against mass picketing which interferes with ingress and egress. In *Kaplan's Fruit & Produce Co.* v. *Superior Court, supra,* 26 Cal.3d 60, the court reasoned that the blocking of access by union pickets constitutes an unfair labor practice under the Agricultural Labor Relations Act (ALRA) (patterned on the NLRA) only if it coerces employees or if it occurs in connection with an unlawful secondary boycott. Obstruction of access of customers by a primary picket line is not an unfair labor practice under the ALRA. Because blockage of customer access is not in itself an unfair labor practice, local court decisions enjoining obstructions to access do not threaten significant interference with labor board adjudications. Consequently, the only issues which the employer can present to the board are much narrower than the issue it can bring before the superior court. (*Id.* at pp. 74, 75.)

The Supreme Court distinguished *Sears* on the grounds that in *Sears* the issues which would have been raised in an unfair labor practice charge and those raised by the state trespass claim were "completely unrelated" and, accordingly, permitting the trespass action to go forward created " 'no realistic risk of interference' " with the labor board's primary jurisdiction. (*Operating Engineers* v. *Jones, supra*, 460 U.S. at p. 683 [75 L.Ed.2d at p. 380].)

## II.

Recognizing that the *same conduct* was the basis for both the unfair labor practice charge and the state court injunction, Hillhaven argues that the local interest exception should apply here because the focus of the NLRB unfair labor practice proceeding would be limited to protecting the *employees* of Hillhaven against union acts in violation of federal law. The state court proceeding would focus on the tortious violation by Local 250 of state trespass and breach of the peace laws and it would afford protection to Hillhaven, its employees and its elderly residents "from the Union's breach of the peace, disorderly conduct, intimidation, and blocking of access in violation of state law."

Hillhaven further argues the state has a compelling interest in protecting its people from threatened violence, trespass and breaches of the peace. It finds support in several California cases involving mass picketing accompanied by actual violence or serious threats of violence and/or mass picketing obstructing access. (See *Kaplan's Fruit & Produce Co.* v. *Superior Court, supra*, 26 Cal.3d 60 [mass picketing blocking ingress and egress]; *United Farm Workers Organizing Committee* v. *Superior Court* (1971) 4 Cal.3d 556 [94 Cal.Rptr. 263, 483 P.2d 1215] [same]; *M Restaurants, Inc.* v. *San Francisco Local Joint Exec. Bd. Culinary etc. Union* (1981) 124 Cal.App.3d 666 [177 Cal.Rptr. 690] [mass picketing blocking ingress and egress accompanied by actual threats of violence]; *International Molders etc. Union* v. *Superior Court* (1977) 70 Cal.App.3d 395, 404-406 [138 Cal.Rptr. 794] [mass picketing involving actual threats of violence]; *California Retail Liquor Dealers Institute* v. *United Farm Workers* (1976) 57 Cal.App.3d 606 [129 Cal.Rptr. 407] [mass picketing obstructing ingress and egress verbal assaults and threats to customers]; *J. R. Norton Co.* v. *General Teamsters, Warehousemen & Helpers Union* (1989) 208 Cal.App.3d 430 [256 Cal.Rptr. 246] [actual or threatened violence to persons and destruction of property].) These cases are distinguishable as all involve actual violence or true threats of violence or actual blockage of ingress and egress, well-established exceptions to *Garmon* preemption. Moreover, in none of them had the labor board exercised its jurisdiction, as it did here.

Hillhaven framed its state court complaint for damages and injunction so as to come within recognized categories of the local interest exception to preemption. The complaint alleged representatives of Local 250 blocked halls; threatened to injure, assault or batter, and have injured, assaulted or battered plaintiff's individual employees, residents, and others; sought to prevent people from entering or departing the premises; threatened to damage or actually damaged personal property (such as motor vehicles) of Hillhaven, its employees, suppliers, and others. The declarations supporting the request for injunction do not, however, support the allegations of actual violence or threats of violence (whether verbal or nonverbal). Nor do they support the allegations of threats to damage personal property or actual blockage of ingress and egress. The actions of Local 250 here do not approach the types of conduct found to warrant application of the local interest exception in the cases Hillhaven relies upon.

Certainly, the state has a significant interest in protecting convalescent home residents, employees, and others from the type of disruptive conduct which occurred here. Nursing and convalescent homes are highly regulated by the state, and residents of such nursing homes are particularly vulnerable to breaches of the peace. But even if the conduct at issue is considered sufficiently threatening to warrant application of the local interest exception and issuance of the TRO in the first instance, we are nevertheless convinced that once the matter was placed before the NLRB by the employer and the board issued the complaint, further state court action was preempted.

The issues raised before the board in the unfair labor practice proceeding and those before the superior court do not appear to be "identical"; though there is considerable overlap. The state court complaint filed by Hillhaven alleged, among other things, that the conduct of Local 250 was intended to "threaten, intimidate, coerce and put in fear" Hillhaven's employees and others. The NLRB attorney assigned to investigate the charge advised Local 250 that: "The Employer has presented evidence tending to support a prima facie case that Local 250 violated Section 8(b)(1)(A) of the Act when approximately 30 Union representatives entered and walked through the Employer's Oakland facility on or about July 28, 1994 *because such conduct disrupted the Employer's work place and interfered with the Employer's care and treatment of its patients.*" (Italics added.) The complaint and notice of hearing issued by the regional director alleged the same behavior, including the allegation that these actions interfered with and disrupted normal operations and that they "restrained and coerced" employees in the exercise of their rights under section 7 of the NLRA, thereby constituting unfair labor practices under section 8(b)(1)(A) and section 2(6) and (7) of the NLRA.

In theory, simultaneous jurisdiction of the NLRB and state court is possible for conduct arguably *prohibited* under the NLRA. Indeed, the local interest exception is founded upon a recognition that certain conduct can be the basis for state court action even though the same conduct might constitute an unfair labor practice under the NLRA.[8] (E.g., *Sears, Roebuck & Co. v. Carpenters, supra*, at pp. 197-198 [56 L.Ed.2d at pp. 225-226].) However, no case cited by the parties or found by us has failed to find preemption where not only has the NLRB actually exercised jurisdiction but the regional director of the NLRB has responded by issuing a complaint and noticing a hearing.[9]

Where the NLRB has exercised its jurisdiction, as here, there is a real and substantial opportunity for conflict. Disparate factual determinations regarding what actually occurred during the incident are a real possibility. Furthermore, although the issues presented to the NLRB and the superior court are

---

[8]The legislative history of section 8(b)(1)(A) of the NLRA recognized: " 'Some of these acts are illegal under state law, but we see no reason why they should not also constitute unfair labor practices . . . .' " (*United Workers* v. *Laburnum Corp., supra*, 347 U.S. 656, 668 [98 L.Ed. 1025, 1033], italics omitted.) As noted by Senator Taft, a sponsor of the NLRA: " 'There is no reason in the world why there should not be two remedies for an act of that kind.' " (*Id.*, at pp. 668-669 [98 L.Ed.2d at pp. 1033-1034, citing 93 Cong. Rec. 4024, italics omitted; but see *Consolidated Theatres, Inc.* v. *Theatrical Stage Employees Union* (1968) 69 Cal.2d 713, 721-722 [73 Cal.Rptr. 213, 447 P.2d 325] [" 'when an activity is *arguably* subject to' those sections of the Act which define such an unfair labor practice, 'the States as well as the federal courts must defer to the exclusive competence of the . . . Board' [quoting *San Diego Unions* v. *Garmon* 359 U.S. at p. 245 (3 L.Ed.2d at p. 359)] and are therefore ousted of jurisdiction to proceed unless and until *either* (1) The Board actually declines to assert jurisdiction over the dispute . . . *or* (2) it is shown by the party seeking to invoke state jurisdiction that the Board would decline to assert jurisdiction if application were made to it (citation)." (Italics in *consolidated Theatres.*)].)

[9]In a supplemental letter brief, filed at our request, Hillhaven argues that the California Supreme Court in *Kaplan's Fruit & Produce Co.* v. *Superior Court, supra*, 26 Cal.3d 60 "held that a concurrently filed unfair labor practice charge arising out of the same series of incidents does not preempt a state court's authority to issue an injunction." (See *Kaplan's* at p. 66.) In *Kaplan's*, the employer filed an unfair labor practice charge with the Agricultural Labor Relations Board (ALRB) and also filed a state court injunction action to enjoin blocking of access. However, "[T]he regional counsel for ALRB declined to issue a complaint, stating that the board's investigation revealed that 'the UFW [Union] did *not* conduct mass picketing or block access to the Kaplan stand.' . . . [T]he picketing . . . was primary activity and that the manner in which it was conducted did not violate any provisions of the ALRA." (*Id.* at p. 67.)

Although we are not bound by the NLRB precedent, we note that in *Loehmann's Plaza* (1991) 305 NLRB No. 81 [138 LRRM 1452 (BNA)], the NLRB ruled that in the context of *arguably protected* activity, preemption attaches at the point when the general counsel issues an unfair labor practice complaint concerning that protected activity and respondent must show it has taken affirmative action to have any state court injunction withdrawn within seven days of the issuance of the complaint. (138 LRRM (BNA) at pp. 1461-1462.) The NLRB expressly limited its opinion to arguably *protected* activity. (*Id.* at fn. 39.)

not "identical" (*Sears, Roebuck & Co.* v. *Carpenters, supra,* 436 U.S. at p. 197 [56 L.Ed.2d at p. 225]), neither are they "completely unrelated." (*Sears, supra,* at p. 198 [56 L.Ed.2d at p. 226]; *Operating Engineers* v. *Jones, supra,* 460 U.S. at p. 683 [75 L.Ed.2d at p. 380].) To the extent both actions involve allegations of coercion and intimidation of employees, there is a core identity of issues presented to the labor board and the court, making conflict even more likely.

It is also possible that resolution of some of the state court claims would require not only reference to, but interpretation of the collective bargaining agreement between the parties. We recognize that the mere assertion of the existence of or reference to a collective bargaining agreement does not warrant preemption. (*Lingle* v. *Norge Division of Magic Chef, Inc.* (1988) 486 U.S. 399, 409-410 [100 L.Ed.2d 399, 409-410, 108 S.Ct. 1877].) In addressing the preemption issue arising under section 301 of the Labor Management Relations Act of 1947 (29 U.S.C. § 185), the United States Supreme Court has observed, "[I]f the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted and federal labor-law principles—necessarily uniform throughout the Nation—must be employed to resolve the dispute." (486 U.S. at pp. 405-406 [100 L.Ed.2d at pp. 418-419].) However, ". . . even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." (*Lingle* v. *Norge Division of Magic Chef, Inc., supra,* 486 U.S. at pp. 409-410 [100 L.Ed.2d at pp. 420-421].)[10]

Hillhaven referred to the collective bargaining agreement several times in pleadings submitted in support of its preliminary injunction request and a copy of the agreement was attached as an exhibit to the declaration of Hillhaven's facility administrator.[11] At the hearing on the preliminary injunction, counsel for Local 250 argued vigorously that access by union

[10]The Supreme Court in *Lingle* noted that only section 301 preemption was at issue in that case. (486 U.S. at p. 409, fn. 8 [100 L.Ed.2d at pp. 420-421].) The court acknowledged that although section 301 preempts state law only insofar as resolution of the state law claim requires the interpretation of a collective bargaining agreement, application of other federal labor law principles, such as the *Garmon* doctrine, may result in preemption.

[11]The memorandum of points and authorities submitted by Hillhaven in support of the preliminary injunction noted that "the collective bargaining agreement provides that the union representatives must check in upon arrival. (See Holland Decl., Exhibit B at § 8.1.)" Further,

representatives to the employee's facility was negotiated in the course of collective bargaining and that dispute over the interpretation or application of the agreement was subject to an arbitrator's decision.[12] Although Hill-haven expressly disclaimed that it was attempting to have the court enforce the agreement, it did suggest the court "look at it as a guide to what is reasonable under these circumstances." The court itself stated it was not interpreting the contract. Nevertheless, the right of the union's representatives to be on the premises at all flowed from the collective bargaining agreement. Questions involving the alleged trespass, the number of union representatives allowed to enter the facility, and where those representatives were permitted access would appear to be issues turning upon interpretation of the bargaining agreement in the first instance. In important particulars, such as the right of union representatives to meet with employees, the order appears to conflict with the collective bargaining agreement.

Finally, the injunctive relief allowed by the court not only impinges upon the rights arising under the collective bargaining agreement, but creates a real possibility of conflict with NLRB rulings on issues such as union access to employees at their place of work.[13]

We do not say the superior court would be without jurisdiction to intervene in the event that conduct involving actual violence, serious threats of violence, or obstruction of access, should such occur in the future. State criminal laws may be invoked in the case of criminal violations by union members and state tort actions may proceed where they create "no realistic risk of interference" with the board's primary jurisdiction. (*Sears, Roebuck & Co.* v. *Carpenters, supra,* 436 U.S. at p. 198 [56 L.Ed.2d at p. 226]; *Operating Engineers* v. *Jones, supra,* 460 U.S. at p. 683 [75 L.Ed.2d at p.

---

a section of those points and authorities is devoted to the agreement, including allegations that the agreement limits the union to having one representative at a time visit the facility to monitor working conditions and prohibits the union from discussing union business in the presence of residents, an interpretation disputed by Local 250.

[12]In its supplemental brief, Local 250 refers to an existing grievance and dispute between the parties as to the number of union representatives allowed to enter the facility at one time pursuant to the collective bargaining agreement.

[13]For example, in the NLRB settlement of the unfair labor practice charges arising from the actions alleged herein, Local 250 agreed it would not intentionally disrupt normal operations by "chatting with employees in patient areas and talking to patients." (See, *ante,* p. 853.) The agreement did not preclude union representative-employee discussion of union business in the presence of patients outside "patient areas." Indeed, the settlement agreement specifically allowed "normal practice, as permitted by the contract, regarding servicing of the collective bargaining agreement." In contrast, the state court injunction was far more restrictive, prohibiting union representatives from conducting union business or speaking with employees about union business in the presence or within hearing distance of any resident. The conflict between these two remedies is apparent.

380].) For example, should a patient suffer injury from the union's conduct the patient may bring a claim for intentional infliction of emotional distress. (*Farmer* v. *Carpenters*, *supra*, 430 U.S. 290.)

Here, however, at the latest once the NLRB issued its complaint, the state tort action created a realistic risk of interference with the NLRB's primary jurisdiction. For these reasons we conclude the state court action for injunctive relief has been preempted by the NLRA. The judgment is reversed.

Phelan, J., and Haerle, J., concurred.

A petition for a rehearing was denied January 26, 1996, and respondent's petition for review by the Supreme Court was denied April 18, 1996.