[No. S095918. May 16, 2002.]

TERENCE SILO, Plaintiff and Respondent, v.
CHW MEDICAL FOUNDATION et al., Defendants and Appellants.

**COUNSEL**

Foley Lardner Weissburg & Aronson, Foley & Lardner, Stephen W. Parrish and John H. Douglas for Defendants and Appellants.

Sidley Austin Brown & Wood, Jeffrey A. Berman, James M. Harris, Gene C. Schaerr and Nicholas Miller for General Conference of Seventh-day Adventists, The Church of Jesus· Christ of Latter-day Saints, American Baptist Churches in the USA, Clifton Kirkpatrick, as Stated Clerk of the General Assembly of the Presbyterian Church (U.S.A.), the Worldwide Church of God, The First Church of Christ, Scientist, California Catholic Conference, Loma Linda University & Medical Center, Adventist Health, Association of Christian Schools International and the Christian Legal Society as Amici Curiae on behalf of Defendants and Appellants.

Alan J. Reinach; Alan E. Brownstein; David Lewellyn; Bassi, Martini & Blum and Fred Blum for the California Coalition for the Free Exercise of Religion as Amicus Curiae on behalf of Defendants and Appellants.

Law Offices of Steven Drapkin and Steven Drapkin for Council on Religious Freedom as Amicus Curiae on behalf of Defendants and Appellants.

Matheny Poidmore Linkert & Sears, Matheny, Sears, Linkert & Long, Eric R. Wiesel, Amanda C. Raffanti and Anthony J. Poidmore for Plaintiff and Respondent.

## OPINION

**MORENO, J.**—In this case, we consider whether a Catholic hospital exempt from the Fair Employment and Housing Act (the FEHA), Government Code section 12900 et seq.,[1] because it is "a religious corporation . . . not organized for private profit" (§ 12926, subd. (d)) and therefore not an "employer" within the meaning of the FEHA, may nonetheless be liable for terminating an employee in violation of public policy (see *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314]). The public policy at issue prohibits religious discrimination. Specifically, we address whether terminating an employee of a religiously affiliated health care organization for using what it considers objectionable religious speech in the workplace constitutes a form of religious discrimination that violates a fundamental public policy. We conclude that a religious organization may not be held liable under these circumstances. Although there is a clear, constitutionally based state policy against religious discrimination in employment (Cal. Const., art. I, § 8), there is also a countervailing policy rooted in the free exercise of religion clause of the First Amendment to the United States Constitution, as well as the comparable California constitutional right (Cal. Const., art. I, § 4), that permits religious organizations to define themselves and their religious message. We therefore conclude there is no clear public policy against religious organizations prohibiting what they consider to be inappropriate religious speech in the workplace and therefore no liability in tort for such organizations' termination of an employee who engages in such speech.

### I. STATEMENT OF FACTS

Defendant CHW Medical Foundation (CHWMF) is organized for the delivery of health care services. It was formed as a nonprofit public benefit corporation by three "Sponsoring Congregations" of Roman Catholic religious communities of women: the Sisters of Mercy of Burlingame, the Sisters of Mercy of Auburn and the Sisters of St. Dominic of the Most Holy Rosary of Adrian, Michigan. Its "Sponsoring Congregations" are organized under the auspices of the Roman Catholic Church for the purpose of furthering the church's teachings and faith. Its articles of incorporation require it to conduct its activities "in a manner which is consistent with and supportive of the Mission and Corporate Philosophy" of the Sponsoring Congregations, and "in a manner which conforms to the Ethical and Religious Directives for Catholic Health Facilities as may, from time to time, be approved by the National Conference for Catholic Bishops . . . ." Its bylaws provide that its activities "shall be carried on subject to the moral and

---

[1]All statutory references are to the Government Code unless otherwise indicated.

ethical principles of the Roman Catholic Church." Its board of directors, and its officers, must support the Sponsoring Congregations' mission of healing and providing services to the sick and poor in the Catholic moral tradition and must support the Ethical and Religious Directives for Catholic Health Services. CHWMF is exempt from taxation by the State of California as a nonprofit religious or charitable institution (Rev. & Tax. Code, § 23701d), and is exempt from federal taxation as an entity operated by the Roman Catholic Church in the United States. However, CHWMF does not provide services only to patients of the Roman Catholic faith, does not have a chaplaincy or chapel, does not sponsor or conduct religious services, prayer groups or Bible studies on its premises and does not publicly place or display Bibles, crucifixes or any other religious symbols.

CHWMF hired plaintiff Terence Silo in July 1991 to be a file clerk in its Sacramento medical clinic's medical records department. In November of 1992, he experienced a religious conversion in which, as he testified, "I gave my life to Christ, . . . my heart was filled with the Holy Spirit, and my life was changed." After this conversion experience, he began to share his experience and his faith with others at his workplace. In January of 1993, Silo met with defendants Mary King, CHWMF's human resources manager, and Ruth Ann Lewis, the manager of the medical records department. He was told of two complaints, one by a fellow employee who reported that he had asked her not to "use the name of God in vain" and the other from a patient who complained that Silo was "preaching" at him or her. He was counseled by King and Lewis that he should not use the word "God . . . unless it's off the clock."

Meanwhile Silo was given a less than satisfactory performance evaluation in December 1992. In February 1993 he was told his work was not getting done on time and he was placed on probation, with a warning that he would be discharged if there was no improvement. He was informed on April 23, 1993, that his work performance had improved but that he would continue on probation.

On April 30, 1993, Silo was summoned to another meeting with King and Lewis. They informed him that he was being terminated and gave him a "termination paper" that purported to explain the reasons for his discharge. According to that document, Silo "has been counseled three times previously . . . regarding Soul Saving [*sic*] on clinic premises. On the last occasion, he was told that if this continued he would be terminated." In spite of this warning, the document stated that there were three known incidents in April of 1993 in which he continued to "preach" and "Soul Save." On all three occasions, "he was asked to stop but continued preaching. Three of the

employees involved have complained of harassment." The document also recited that Silo was on "probationary status for poor work performance." Silo, in his subsequent testimony, denied harassing the employees in question and insisted that he had not been asked to stop his religious discussions. He also claimed that the April 1993 incidents occurred during his lunch hour, i.e., off the clock.

Silo filed a timely complaint with the California Department of Fair Employment and Housing against his employer and, after receiving a right-to-sue letter, filed suit against CHWMF, King, and Lewis. Silo's complaint alleged six causes of action: employment discrimination in violation of public policy, employment discrimination in violation of the FEHA (§ 12920, subd. (a)), breach of contract, breach of the implied covenant of good faith and fair dealing, intentional infliction of emotional distress, and malicious prosecution based on CHWMF's appeal of Silo's unemployment benefits. Defendants successfully demurred to the cause of action for intentional infliction of emotional distress. CHWMF moved for summary adjudication on all remaining causes of action except those based on contract. King and Lewis moved for summary judgment on the employment discrimination claim under the FEHA, the only remaining cause of action in which they were named as defendants. Defendants sought summary judgment on the FEHA cause of action, contending that CHWMF, as a nonprofit religious corporation, was exempt from the FEHA as a matter of law and therefore King and Lewis were not acting as agents of an entity subject to the FEHA. They argued the first cause of action must fail because there was no clear public policy against a religious employer engaging in religious discrimination.

The court denied the motion for summary judgment on the ground that CHWMF was organized under California law as a nonprofit public benefit corporation, not a nonprofit religious corporation and it was therefore unclear whether the FEHA exemption found in section 12926, subdivision (d) applied, leaving a material issue of fact as to whether CHWMF's purposes and functions were essentially religious.

The case was tried before a jury. By special verdict, the jury found that defendants unlawfully discriminated against Silo based on his religious beliefs and practices in violation of the FEHA and that they terminated his employment in violation of public policy. The jury found no breach of contract and no breach of the implied covenant of good faith and fair dealing. The jury awarded Silo $6,305 in economic damages and $1 in noneconomic damages. The court subsequently awarded Silo $155,245.75 in attorney fees pursuant to Code of Civil Procedure section 1021.5.

The Court of Appeal originally affirmed the judgment, holding that CHWMF was in fact an "employer" under the FEHA. We granted review

and eventually retransferred the case to the Court of Appeal with directions to vacate its prior decision and to reconsider the cause in light of *Kelly v. Methodist Hospital of So. California* (2000) 22 Cal.4th 1108 [95 Cal.Rptr.2d 514, 997 P.2d 1169] (*Kelly*) and *McKeon v. Mercy Healthcare Sacramento* (1998) 19 Cal.4th 321 [79 Cal.Rptr.2d 319, 965 P.2d 1189] (*McKeon*). In *McKeon*, we construed the language of the religious exemption to the FEHA, found in section 12926, subdivision (d), which provides that an "employer" subject to the FEHA "does not include a religious association or corporation not organized for private profit." The defendant in that case was Mercy Healthcare Sacramento, which is affiliated with CHWMF and which was also incorporated under the Nonprofit Public Benefit Corporation Law. We rejected the position advanced by plaintiffs in that case, and adopted by the Court of Appeal, that in order to qualify for this exemption, the organization must be incorporated under the Nonprofit Religious Corporation Law. We concluded, rather, based on the language of the statute as well as its legislative history, that an organization need only be "religious" and "not organized for private profit" to qualify for the exemption. (*McKeon, supra,* 19 Cal.4th at pp. 325-326.)

In *Kelly*, we rejected the argument that a nonprofit religious organization cannot qualify for a religious exemption if it is engaged in the secular business of running a hospital rather than "religious indoctrination or propagation." (*Kelly, supra,* 22 Cal.4th at p. 1113.) We concluded from a review of the legislative history and statutory context that the exemption was intended to apply to hospitals with a religious affiliation and motivation. (*Id.* at pp. 1121-1125.)

On remand, the Court of Appeal held that CHWMF was a religious employer exempt from the FEHA, agreeing that the undisputed evidence established that CHWMF was a religious corporation not organized for private profit. But the Court of Appeal further concluded that there was no bar to Silo's claim of termination in violation of public policy. The court reasoned that, notwithstanding the FEHA exemption, there was a policy against religious discrimination in employment delineated in article I, section 8 of the California Constitution. The court found this policy sufficiently fundamental and beneficial to support a wrongful termination claim and therefore affirmed the verdict against CHWMF.

We granted review to decide whether, as a matter of law, CHWMF may be held liable in tort for wrongfully terminating an employee, in violation of the public policy against religious discrimination, for engaging in religious speech in the workplace.

## II. Discussion

"[W]hile an at-will employee may be terminated for no reason, or for an arbitrary or irrational reason, there can be no right to terminate for an unlawful reason or a purpose that contravenes fundamental public policy." (*Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1094 [4 Cal.Rptr.2d 874, 824 P.2d 680] (*Gantt*); see also *Tameny v. Atlantic Richfield Co., supra,* 27 Cal.3d 167.) We have held that this public policy exception to the at-will employment rule must be based on policies "carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions . . . ." (*Gantt, supra,* 1 Cal.4th at p. 1095.) This requirement "grew from our belief that ' "public policy" as a concept is notoriously resistant to precise definition, and that courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch' in order to avoid judicial policymaking." (*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 76 [78 Cal.Rptr.2d 16, 960 P.2d 1046] (*Green*).) It also serves the function of ensuring that employers are on notice concerning the public policies they are charged with violating. "The employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes . . . ." (*Gantt, supra,* 1 Cal.4th at p. 1095; see also *Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1256, fn. 9 [32 Cal.Rptr.2d 223, 876 P.2d 1022].) The public policy that is the basis of this exception must furthermore be " 'public' in that it 'affects society at large' rather than the individual, must have been articulated at the time of discharge, and must be ' "fundamental" ' and ' "substantial." ' " (*Green, supra,* at p. 76.)

We note at the outset that CHWMF's exemption from FEHA liability does not necessarily mean that it is without tort liability for terminating Silo in violation of public policy. In *Rojo v. Kliger* (1990) 52 Cal.3d 65, 82 [276 Cal.Rptr. 130, 801 P.2d 373], we held that the FEHA did not provide the exclusive remedy for employment discrimination claims but that common law tort actions and other statutory actions also may be brought. It is true that in *Jennings v. Marralle* (1994) 8 Cal.4th 121 [32 Cal.Rptr.2d 275, 876 P.2d 1074], we held that the FEHA exemption for employers who employ fewer than five persons (§ 12926, subd. (d)), precluded a tortious wrongful discharge claim based on the general public policy statements within the FEHA itself (see §§ 12920, 12921). We reasoned, in essence, that a statutory scheme providing for a small employer exemption could not be the basis for a public policy claim circumventing that exemption. (*Jennings, supra,* 8 Cal.4th at pp. 134-135.) But as we acknowledged, the form of employment discrimination at issue in that case, age discrimination, had only a statutory, not a constitutional, basis. (*Ibid.*)

■ In the present case, although CHWMF is a religious organization exempt from the FEHA and Silo therefore has no basis in the FEHA for a public policy claim, he argues that a fundamental policy against religious discrimination may be found in article I, section 8 of the California Constitution, which states that "[a] person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, *creed*, color, or national or ethnic origin." (Italics added.) We have held that this constitutional provision articulates a fundamental public policy against sex discrimination sufficient to sustain a wrongful discharge action. (See *Rojo v. Kliger, supra*, 52 Cal.3d 65, 89-90; see also *Carmichael v. Alfano Temporary Personnel* (1991) 233 Cal.App.3d 1126 [285 Cal.Rptr. 143] [fundamental public policy against racial discrimination].) Silo argues, correctly, that we must come to the same conclusion with regard to the constitutional prohibition against religious discrimination, i.e., discrimination on the basis of creed.

While Silo acknowledges that such prohibition of religious discrimination does not compel an employer to acquiesce to any and all of an employee's religious practices, he asserts that the employer must reasonably accommodate such practices. ■ As this court explained in *Rankins v. Commission on Professional Competence* (1979) 24 Cal.3d 167, 174 [154 Cal.Rptr. 907, 593 P.2d 852], the duty of reasonable accommodation of religious practice implicit in article I, section 8 of the California Constitution "forbids disqualification of employees for religious practices unless reasonable accommodation by the employer is impossible without undue hardship."

■ Silo argues that CHWMF did not reasonably accommodate his religious practices. He concedes that CHWMF had the right to terminate him for proselytizing in a manner that interfered with the proper performance of his employment duties (see *Knight v. Connecticut Dept. of Public Health* (2d Cir. 2001) 275 F.3d 156), or for directing his proselytizing activity at employees who made clear their objections to such activities. He claims, however, that he was terminated on neither of these grounds. Although he admitted at trial that he initially overstepped the proper bounds by allowing proselytizing to interfere with his work, and in using religious language with at least one patient, he testified that the April 1993 religious discussions for which he was terminated occurred during his lunch hour or break time and involved employees who did not register their objections. Viewing the record in the light most favorable to the judgment, we presume the jury found this testimony credible. Because such sharing or discussion is, he claims, integral to his evangelical Christian practice, and because disallowing such a practice in the workplace—even on his own time with willing employees—is not a reasonable accommodation of his religion, Silo claims

that his discharge was in violation of the fundamental public policy against religious discrimination.

CHWMF argues that it has a countervailing right as an essentially religious organization to choose employees who will further its religious mission free from government interference. It locates that right in the free exercise and establishment clauses of the First Amendment to the United States Constitution and article I, section 4 of the California Constitution.

The clearest cases of judicial recognition of this constitutional right of religious organizations to choose their own employees have been in the employment of clergy. For example, in *Schmoll v. Chapman University* (1999) 70 Cal.App.4th 1434 [83 Cal.Rptr.2d 426], a university chaplain of a church-affiliated university not exempt from the FEHA filed a lawsuit alleging the university was engaged in unlawful sexual discrimination when it reduced her work hours. The court held that judicial review of a religious organization's employment relationship with its clergy "results in excessive [government] entanglement with religion" in violation of the establishment clause (*Schmoll, supra,* 70 Cal.App.4th at p. 1442; see *Lemon v. Kurtzman* (1971) 403 U.S. 602, 613 91 S.Ct. 2105, 2111-2112, 29 L.Ed.2d 745]) because the court "would have to inquire into the good faith of the university's reasons for cutting back [the minister's] hours and adjudge the legitimacy of the church-affiliated institution's own perception of its ministerial needs." (*Schmoll, supra,* 70 Cal.App.4th at p. 1442.)

The court also concluded that judicial intervention would violate the free exercise clause, which " 'is guaranteed not only to individuals but also to churches in their collective capacities, which must have "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." ' " (*Schmoll v. Chapman University, supra,* 70 Cal.App.4th at p. 1443.) Such a right " 'underlies the well-being of religious community, [citation], for perpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its doctrines both to its own membership and to the world at large.' " (*Ibid.*)

Other courts, both state and federal, have likewise concluded that selection and termination of clergy or ecclesiastical leadership should be essentially off-limits to courts. (See, e.g., *Young v. N. Ill. Conf. of United Methodist Church* (7th Cir. 1994) 21 F.3d 184; *Scharon v. St. Luke's Episcopal Presbyterian Hospitals* (8th Cir. 1991) 929 F.2d 360, 362-364; *Minker v. Baltimore Annual Conf.* (D.C. Cir. 1990) 894 F.2d 1354; *Serbian Orthodox Diocese v. Milivojevich* (1976) 426 U.S. 696 [96 S.Ct. 2372, 49 L.Ed.2d

151]; *Kedroff v. St. Nicholas Cathedral* (1952) 344 U.S. 94 [73 S.Ct. 143, 97 L.Ed. 120].) Courts have also recognized a constitutional constraint on interference with employment decisions related to parochial schoolteachers and teachers of religious subjects. (See, e.g., *Gosche v. Calvert High School* (N.D. Ohio 1998) 997 F.Supp. 867; *Boyd v. Harding Academy of Memphis, Inc.* (6th Cir. 1996) 88 F.3d 410; *Little v. Wuerl* (3d Cir. 1991) 929 F.2d 944, 947-948.)

The right or capacity of religious employers to engage in religious discrimination against employees not performing obviously religious functions has also been upheld. In *Corporation of Presiding Bishop v. Amos* (1987) 483 U.S. 327 [107 S.Ct. 2862, 97 L.Ed.2d 273] (*Amos*) the court considered the constitutionality of section 702 of the federal Civil Rights Act of 1964 (42 U.S.C. § 2000e-1), which exempts from title VII of that act's anti-employment-discrimination prohibitions "a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." In that case, a building engineer for a Mormon-affiliated gymnasium was discharged because he had failed to fully qualify as a member of the Mormon Church. He challenged section 702 of the Civil Rights Act of 1964 on the grounds that it granted a religious association a special privilege and therefore was in violation of the establishment clause.

The court unanimously rejected his contention. Applying the three-part test set out in *Lemon v. Kurtzman, supra,* 403 U.S. 602, the majority first concluded that the exemption met *Lemon's* requirements that a law serve a secular legislative purpose. "Under the *Lemon* analysis, it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." (*Amos, supra,* 483 U.S. at p. 335 [107 S.Ct. at p. 2868].) The court rejected the argument that only an exemption narrowly crafted to include the *religious activities* of religious employers, such as was the case before title VII of the Civil Rights Act of 1964 (title VII) was amended in 1972, could pass muster under the establishment clause. "We may assume for the sake of argument that the pre-1972 exemption was adequate in the sense that the Free Exercise Clause required no more. Nonetheless, it is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious. The line is hardly a bright one, and an organization might understandably be concerned that a judge would not understand its religious tenets and sense of mission." (*Amos, supra,* at p. 336 [107 S.Ct. at p. 2868], fn. omitted.)

The court also found that the exemption passed muster under the other two prongs of the *Lemon* test: it did not have the effect of promoting government sponsorship of religion, but merely allowed religious organizations to advance their own religious objectives. It also did not lead to excessive government entanglement in religion but rather further separated government and religion. (*Amos, supra*, 483 U.S. at pp. 337-339 [107 S.Ct. at pp. 2869-2870].)

Against this background, we return to the question before us: Is a nonprofit religious organization's termination of an employee for what it considered objectionable religious speech contrary to a fundamental public policy of the state "tethered to" a constitutional or statutory provision? (*Gantt, supra*, 1 Cal.4th at p. 1095.) We conclude that it is not.

Although article I, section 8 of the California Constitution expresses a fundamental policy against religious discrimination in employment and requires reasonable accommodation of employees' religious practices, the state and federal free exercise and establishment clauses give religious organizations some degree of latitude to choose their employees in order to define their religious mission. The FEHA, in section 12926, subdivision (d), expressly exempts nonprofit religious organizations from liability for religious and other forms of discrimination in order to further that goal.[2] As *Amos, supra*, 483 U.S. 327, recognized, the legislative exemption of religious employers from liability for *all* religious discrimination claims is a legitimate means of promoting the autonomy of religious organizations implicit in the state and federal Constitutions' free exercise and establishment clauses, even if such an exemption is not strictly necessary to comply with these provisions. Therefore, the public policy against religious discrimination in employment must be qualified by the public policy of permitting religious employers considerable discretion to choose employees who will not interfere with their religious mission or message.

Silo's argument that he was merely a low-level employee who did not help to shape CHWMF's religious message does not assist him. CHWMF's problem was not that Silo failed to properly perform a religious function that had been assigned to him, but rather that he was engaging in religious *communications*—proselytizing and other forms of religious speech—that the employer neither authorized nor considered appropriate. Nor does the

---

[2]Although the FEHA's exemption of religious organizations is broader than title VII's, inasmuch as it insulates qualifying religious employers from not merely religious discrimination liability but all forms of FEHA liability, all we consider in this case is the exemption from religious discrimination.

fact that a religious organization engages in the secular task of running a medical clinic negate its religious character. As we stated in *Kelly, supra,* 22 Cal.4th at page 1124: "Every religiously affiliated entity generally is both secular and religious to some extent . . . ." Indeed, maintaining a secular appearance in its medical facility that is welcoming to all faiths, thereby deemphasizing its distinctively Catholic affiliation, appears to be part of CHWMF's religiously inspired mission of offering health care to the community. The fulfillment of this mission is consistent with a policy of restricting the speech of employees who express or advocate a particular religious viewpoint.

Thus, even assuming that Silo engaged in such speech only during his work breaks, we can discern no fundamental public policy that places limits on a religious employer's right to control such speech. In other words, in reading the California Constitution, article I, section 8's prohibition against religious discrimination in employment *together with* the free exercise and establishment clauses of the state and federal Constitutions, and with the FEHA's explicit exemption of religious organizations from liability for such discrimination, we cannot say there is a fundamental and substantial public policy that prohibits a religious employer from terminating an employee because of his or her objectionable religious speech in the workplace.

In support of his position, Silo cites *E.E.O.C. v. Pacific Press Pub. Ass'n* (9th Cir. 1982) 676 F.2d 1272, in which the court held that enforcement of title VII's sex discrimination provisions against a nonprofit religious publishing house sued by an editorial secretary did not violate that organization's rights under either the free exercise or establishment clauses. In addressing the free exercise question, the court balanced this statute's impact on the exercise of religious beliefs with the existence of a compelling state interest. It concluded that the organization's policies were not significantly impacted, because the organization did not claim that sexual inequality was part of its beliefs, and that, on the other hand, the state's compelling interest in eliminating sexual discrimination was unquestionable. (*E.E.O.C.,* at pp. 1279-1280.) It further concluded, under the *Lemon* test, that title VII undoubtedly advanced a secular purpose and did not inhibit religion or promote excessive entanglement of government in religion. (*E.E.O.C.,* at pp. 1281-1282.)

We do not consider in this case whether a religious employer would be liable in tort for terminating an employee in violation of a public policy against sexual discrimination found in article I, section 8 of the California Constitution, despite the FEHA exemption. But it is evident that restricting a

religious employer's ability to control religious speech in the workplace raises different constitutional issues than does a prohibition of sexual discrimination, particularly when, as in the case of *E. E. O. C. v. Pacific Press Pub. Ass'n, supra,* 676 F.2d 1272, the organization never claimed such discrimination was part of its doctrine or interfered with its religious mission. In the present case, restricting the ability of a religiously affiliated employer to control religious speech at the workplace would not only potentially interfere with its mission, but could excessively entangle the courts in determining what kind of religious speech is appropriate in a religious organization's workplace. Moreover, the issue before us is not whether enforcement of tort liability in the present case would violate the free exercise clause, but rather whether there is a fundamental policy that would support such liability. For the reasons explained above, we conclude there is not.

Silo points to the 1999 addition of section 12926.2, which states, in subdivision (c), that except as otherwise provided, " 'employer' includes a religious corporation or association with respect to persons employed by the religious association or corporation to perform duties, other than religious duties, at a health care facility operated by the religious association or corporation for the provision of health care that is not restricted to adherents of the religion that established the association or corporation." Although Silo claims the amendment is merely clarifying existing law, it plainly contradicts and overrules our interpretation of the FEHA religious employer exemption in *McKeon, supra,* 19 Cal.4th 321, decided a year before the amendment was passed. Assuming arguendo that the 1999 amendment now creates an unqualified, fundamental public policy against religious health care employers unreasonably restricting religious speech at workplaces—a question we do not decide—that change occurred after Silo's termination, and therefore can have no bearing on his suit. As previously discussed, one of the principal reasons for requiring a *Tameny* claim to be based on statutory or constitutional public policy is to ensure that employers are on notice of the policy at the time of the wrongful termination. (*Gantt, supra,* 1 Cal.4th at p. 1095; see also *Turner v. Anheuser-Busch, Inc., supra,* 7 Cal.4th at p. 1256, fn. 9.) It follows that an employer cannot be held liable for violating a public policy that was not manifest at the time it committed the alleged tortious action. The 1999 enactment, therefore, does not change the disposition of the present case.

## III. DISPOSITION

The judgment of the Court of Appeal is reversed and the cause is remanded for proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.