[No. B151342. Second Dist., Div. One. July 10, 2002.]

SHARRON D. GRANT-BURTON, Plaintiff and Appellant, v. COVENANT CARE, INC., Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

———————

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.C.

**COUNSEL**

Anita Grace Edwards for Plaintiff and Appellant.

Keith A. Fink & Associates, Keith A. Fink and Roksana Ghodsian for Defendant and Respondent.

**OPINION**

**MALLANO, J.**—In this wrongful termination case, the employer discharged an employee, in part because she had participated in a group

discussion with other employees about the fairness of the employer's bonus system. The trial court granted the employer's motion for summary judgment.

We conclude that the employee had a fundamental right rooted in public policy to join in a discussion with other employees about whether they were being equitably compensated. Labor Code section 232 prohibits the discharge of employees for discussing the amount of their wages. We therefore reverse as to the wrongful termination claim.

## I

### BACKGROUND

Defendant Covenant Care, Inc., owns 42 skilled nursing and assisted-living facilities, each of which is supervised by an executive director, sometimes called an administrator. Each facility also has a marketing director. At some facilities, the employees are unionized.

On June 8, 1998, plaintiff Sharron D. Grant-Burton commenced employment with Covenant Care, working as the marketing director at the Candlewood Care Center. In that capacity, she went to various medical facilities and promoted the use of Candlewood for patients who needed skilled nursing services. When a new patient arrived at Candlewood, Grant-Burton handled the admissions paperwork. D'Anna Westbrook, the executive director at Candlewood, was Grant-Burton's immediate supervisor. Grant-Burton was not a union member. She was an at-will employee.

In late 1998, Westbrook asked Grant-Burton to be the program manager of the Alzheimer's unit. Grant-Burton agreed. She attended classes on the subject, at Covenant Care's expense. After Grant-Burton assumed her duties in the Alzheimer's unit, she remained the marketing director but no longer handled the paperwork for new admissions.

On February 4, 1999, Grant-Burton attended a corporate meeting of Covenant Care's marketing directors for Southern California. One of the seven directors brought up the subject of bonuses, asking, "Hey, you guys, how is your bonus structure? How is it set up?" Three or four of the directors said they received bonuses based on an increase in the number of patients or an increase in growth at their facility. One director offered to show the structure of her bonus, saying, "The bonus structure at [my facility] involves a quality mix in that each area has a dollar sign by it: HMO contracts, the overall census of the facility, and your quality mix." The remaining directors, who did not receive bonuses, were surprised to learn that the others did.

During the meeting, Grant-Burton said she did not receive a bonus because Westbrook "did not believe in [them]." Grant-Burton also said she did not care whether she received a bonus because Covenant Care was paying for her continuing education, namely, the classes that prepared her to be the program director of the Alzheimer's unit.

As Covenant Care's director of human resources would later testify about the meeting, "[T]he issues were shared amongst the other marketing and admissions directors, that some had bonuses, some did not have bonuses. And generally, the conversation was 'Well, is that fair; is that not fair? Shouldn't we all have one?' And it's just generally discontent around bonuses."

The day after the meeting, one of Covenant Care's executive directors, Ted Stultz, sent an e-mail to the other executive directors, stating he was "upset" that "discussions of pay and bonus went on." Stultz said that the marketing directors were "not there to be talking about money . . . ." The e-mail mentioned that Stultz's marketing director was offended by the discussion.

Another executive director, John Mastrocola, testified in deposition that he, too, thought the discussion about bonuses was inappropriate. As he put it, "[I]f I'm going to be in with administrators, I don't want to hear administrators talking about what they're making and if they're making a bonus, you know, . . . that's personal." Mastrocola also stated: "It happened once before. We had a maintenance supervisor meeting, and it got back to me . . . . I said, 'Look, you're going to offend some people when you talk about salary.' Nobody can hold a gun to your head and say you can't do it, but it's just, you know, some people are offended, so don't do it."

On February 10, 1999—six days after the marketing directors' meeting—Westbrook went to Grant-Burton's office and fired her. Westbrook said that the discharge was based on what Grant-Burton had said at the February 4 meeting. When asked, Westbrook declined to say what that was. Westbrook also said Grant-Burton was being terminated because she did not have Candlewood's best interests at heart and was unhappy there, which Grant-Burton denied. The termination papers indicated that the discharge was based on a violation of company rules. Grant-Burton asked what rule had been violated. Westbrook did not say. Toward the end of the meeting, Westbrook said, "This is an at-will company, and I don't need a reason to fire you."

Grant-Burton appealed her discharge within the company. Jacqueline Harlow, the director of human resources, investigated the matter. In a letter

addressed to Grant-Burton on March 9, 1999, Harlow mentioned a number of reasons for the discharge. In part, she wrote, "When Ms. Westbrook discovered that you had participated in a discussion surrounding whether or not all Marketing Directors in the Southern California area received a bonus for their efforts and made derogative statements in a public forum about your Executive Director once again, it was the final straw."

During the investigation, Harlow learned that both Westbrook and Mastrocola were "disturbed" that the marketing directors had discussed bonuses. At her deposition, Harlow was asked if the discussion of bonuses was one of Westbrook's reasons for discharging Grant-Burton. Harlow replied, "That was one." Mastrocola testified that, before the February 4, 1999 meeting, the marketing directors routinely met on a monthly basis. After February 4, management decided that the meetings would be held on a quarterly basis, due in part to the discussion about bonuses.

Eventually, Grant-Burton went to work at another skilled nursing facility. She continued to work in marketing and, apparently, was successful at it. During a meeting of department heads at Candlewood, Westbrook said, "[Grant-Burton] is out there stealing our patients." Westbrook's statement was repeated to others—to some of the employees at Candlewood and the case manager at Pacific Hospital who placed patients in skilled nursing facilities.

On February 10, 2000, Grant-Burton filed this action against Covenant Care, alleging claims for wrongful termination in violation of public policy, defamation, breach of contract, breach of the covenant of good faith and fair dealing, and a violation of Labor Code section 232.

Covenant Care filed a motion for summary judgment or, in the alternative, summary adjudication of issues. Grant-Burton filed opposition. The trial court granted the motion and entered judgment in favor of Covenant Care. Grant-Burton filed a timely appeal.

## II

### DISCUSSION

 Based on the principles governing summary judgment and the substantive law applicable to Grant-Burton's claims, we conclude that the cause of action for wrongful termination in violation of public policy should not have been summarily adjudicated.

#### A. *Summary Judgment*

A motion for summary judgment must be granted if all the papers submitted show that there is no triable issue as to any material fact and that

the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

■ " 'A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action cannot be established [or that there is a complete defense to that cause of action]. . . . In reviewing the propriety of a summary judgment, the appellate court independently reviews the record that was before the trial court. . . . We must determine whether the facts as shown by the parties give rise to a triable issue of material fact. . . . [T]he moving party's affidavits are strictly construed while those of the opposing party are liberally construed.'. . . We accept as undisputed facts only those portions of the moving party's evidence that are not contradicted by the opposing party's evidence. . . . In other words, the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences therefrom must be accepted as true." (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 178-179 [70 Cal.Rptr.2d 96], citations omitted.)

■ "[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. That is because of the general principle that a party who seeks a court's action in his favor bears the burden of persuasion thereon. . . . There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. . . ." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493], citation and fn. omitted.)

"[T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he. causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . .

"[The way in which] the parties moving for, and opposing, summary judgment may each carry their burden of persuasion and/or production depends on which [party] would bear what burden of proof at trial." (*Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at pp. 850-851, italics omitted.)

In the present case, the complaint alleged five causes of action. The trial court granted summary judgment and, in the alternative, summarily adjudicated each cause of action in favor of Covenant Care.

On appeal, Grant-Burton raises two issues: whether the trial court erred in summarily adjudicating the causes of action for (1) wrongful termination in violation of . public policy and (2) defamation. Of course, the principles governing summary judgment also apply to summary adjudication. (See *Lomes v. Hartford Financial Services Group, Inc.* (2001) 88 Cal.App.4th 127, 131 [105 Cal.Rptr.2d 471].) In light of those principles, the trial court should have denied the motion as to the wrongful termination claim but properly adjudicated the defamation claim.

## B. *Wrongful Termination in Violation of Public Policy*

■ "Labor Code section 2922 provides in relevant part, 'An employment, having no specified term, may be terminated at the will of either party on notice to the other. . . .' This presumption may be superseded by a contract, express or implied, limiting the employer's right to discharge the employee. . . . Absent any contract, however, the employment is 'at will,' and the employee can be fired with or without good cause. But the employer's right to discharge an 'at will' employee is still subject to limits imposed by public policy, since otherwise the threat of discharge could be used to coerce employees into committing crimes, concealing wrongdoing, or taking other action harmful to the public weal." (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 665 [254 Cal.Rptr. 211, 765 P.2d 373] (*Foley*), citations and fn. omitted.)

"[W]hile an at-will employee may be terminated for no reason, or for an arbitrary or irrational reason, there can be no right to terminate for an unlawful reason or a purpose that contravenes fundamental public policy." (*Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1094 [4 Cal.Rptr.2d 874, 824 P.2d 680], overruled on another point in *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 80, fn. 6 [78 Cal.Rptr.2d 16, 960 P.2d 1046] (*Green*).)

### 1. *Source of Public Policy*

■ Our Supreme Court "[has] established a set of requirements that a policy must satisfy to support a tortious discharge claim. First, the policy must be supported by either constitutional or statutory provisions [or regulations enacted under statutory authority]. Second, the policy must be 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual. Third, the policy must have been articulated [or well established] at the time of the discharge. Fourth, the policy must be 'fundamental' and 'substantial.' " (*Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 889-890 [66 Cal.Rptr.2d 888, 941 P.2d 1157] (*Stevenson*); see *Green, supra,* 19 Cal.4th at pp. 75-76, 79-80, 89-90; accord,

*Silo v. CHW Medical Foundation* (2002) 27 Cal.4th 1097, 1104 [119 Cal.Rptr.2d 698, 45 P.3d 1162].)

" 'Yet despite its broad acceptance, the principle underlying the public policy exception is more easily stated than applied. The difficulty, of course, lies in determining where and how to draw the line between claims that genuinely involve matters of public policy, and those that concern merely ordinary disputes between employer and employee.' " (*Stevenson, supra,* 16 Cal.4th at p. 889.)

" '[T]he term "public policy" is inherently not subject to precise definition. . . .' " (*Gantt v. Sentry Insurance, supra,* 1 Cal.4th at p. 1094.) "[I]t is generally agreed that . . . courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch, 'lest they mistake their own predilections for public policy . . . .' . . . [C]ourts 'should proceed cautiously' if called upon to declare public policy absent some prior legislative expression on the subject." (*Id.* at p. 1095.)

In this case, Grant-Burton contends that Covenant Care violated public policy as reflected in Labor Code section 232, which provides: "No employer shall do any of the following: [¶] . . . [¶] . . . Discharge, formally discipline, or otherwise discriminate against, for job advancement, an employee who discloses the amount of his or her *wages.*" (Lab. Code, § 232, subd. (c), italics added (hereafter section 232).) "Wages" is defined to "include[] all amounts for *labor* performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." (*Id.,* § 200, subd. (a), italics added.) "Labor," in turn, means "labor, work, or service whether rendered or performed under contract, subcontract, partnership, station plan, or other agreement if the labor to be paid for is performed personally by the person demanding payment." (*Id.,* subd. (b).)

As a preliminary issue, Covenant Care argues that Grant-Burton did not adequately plead a cause of action under section 232. Not so. The complaint alleged that Grant-Burton was discharged for discussing the subject of bonuses with other marketing directors and for saying she did not receive one. The complaint specifically cited section 232. Accordingly, the issues raised in the complaint properly framed the scope of Covenant Care's motion for summary judgment. (See *Government Employees Ins. Co. v. Superior Court* (2000) 79 Cal.App.4th 95, 98, fn. 4 [93 Cal.Rptr.2d 820].)

### a. *Statutory Support*

Turning to the requirements of a public policy claim, Grant-Burton's cause of action for wrongful termination "must be based on [a] polic[y]

'carefully tethered to . . . constitutional or statutory provisions . . . .' . . . This requirement 'grew from [the] belief that " 'public policy' as a concept is notoriously resistant to precise definition . . . ." . . .' " (*Silo v. CHW Medical Foundation, supra,* 27 Cal.4th at p. 1104, citation omitted; accord, *Stevenson, supra,* 16 Cal.4th at p. 889.)

" '[T]ethering public policy to specific constitutional or statutory provisions serves not only to avoid judicial interference with the legislative domain, but also to ensure that employers have adequate notice of the conduct that will subject them to tort liability to the employees they discharge.' " (*Esberg v. Union Oil Co.* (2002) 28 Cal.4th 262 [121 Cal.Rptr.2d 203, 47 P.3d 1069], italics omitted.) ■ Here, Grant-Burton's claim is based directly on a statute: section 232.

### b. *Public Benefit*

Grant-Burton's claim inures to the benefit of the public, not merely her own interests. ■ "The statutes that most clearly support a cause of action for tortious termination in violation of public policy are those that expressly prohibit termination of employment . . . for certain reasons . . . ." (1 Wrongful Employment Termination Practice (Cont.Ed.Bar 2d ed. 2001) § 5.9, p. 233.) Put another way, "[t]ermination of an employee most clearly violates public policy when it contravenes the provision of a statute forbidding termination for a specified reason . . . ." (4 Wilcox, Cal. Employment Law (2002) § 60.04[2][e], p. 60-68.) ■ Section 232 expressly forbids the termination of an employee for disclosing the amount of his or her wages.

Further, even though Grant-Burton and the other marketing directors may not have been members of a union or governed by a collective bargaining agreement, their concerted activity—participating in a group discussion about the fairness of their compensation—was protected under the National Labor Relations Act (29 U.S.C. §§ 151-169) (NLRA). (See *N.L.R.B. v. American Spring Bed Mfg. Co.* (1st Cir. 1982) 670 F.2d 1236, 1242; *Labor Bd. v. Washington Aluminum Co.* (1962) 370 U.S. 9, 14-15 [82 S.Ct. 1099, 1103, 8 L.Ed.2d 298]; *Wilson Trophy Co. v. N.L.R.B.* (8th Cir. 1993) 989 F.2d 1502, 1508.) And it is well settled that a claim for wrongful termination in violation of public policy can be based on a federal statute or regulations. (See *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 170 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314] [Sherman Antitrust Act (15 U.S.C. § 1 et seq.)]; *Green, supra,* 19 Cal.4th at pp. 80-82 [Federal Aviation Administration regulations (14 C.F.R. § 21.143 (1998))].)

The NLRA "guarantees employees the right to engage in 'concerted activities for the purpose of . . . mutual aid or protection.' [The NLRA]

makes it an unfair labor practice for an employer to interfere with [that right]. Concerted activities include matters of common concern . . . , which includes the right to discuss wages." (*N.L.R.B. v. Brookshire Grocery Co.* (5th Cir. 1990) 919 F.2d 359, 362, citation omitted.)

"[The NLRA] fundamentally seeks to protect workers' freedom of association in attaining improved wages and working conditions." (*YMCA of the Pikes Peak Region, Inc. v. N.L.R.B.* (10th Cir. 1990) 914 F.2d 1442, 1455.) "The right of employees to engage in concerted activities . . . with respect to wages is a fundamental [statutory] right guaranteed employees under the [NLRA]. If this right is to be a meaningful one employees must have the right to discuss wages as such discussion is essential." (*Wilson Trophy Co.* (1992) 307 NLRB 509, 511, enforced, *Wilson Trophy Co. v. N.L.R.B., supra,* 989 F.2d 1502.)

"Wage levels, obviously, are one employment term which frequently provide a reason for employees' desire to organize and become represented by a bargaining agent. 'Early in the history of the administration of the [NLRA] the [National Labor Relations] Board recognized the importance of freedom of communication to the free exercise of organization rights.' . . . Thus, a rule which prohibits employees from discussing wages among themselves . . . violates the [NLRA]." (*Koronis Parts, Inc.* (1997) 324 NLRB 675, 694, citation omitted.)

As the United States Supreme Court has noted: "In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution. . . . It is recognized now that satisfactory hours and wages and working conditions in industry . . . have an importance which is not less than the interests of those in the business or industry directly concerned. The health of the present generation and of those as yet unborn may depend on these matters, and the practices in a single factory may have economic repercussions upon a whole region and affect widespread systems of marketing. The merest glance at State and Federal legislation on the subject demonstrates the force of the argument that labor relations are not matters of mere local or private concern. Free discussion concerning the conditions in industry and the causes of labor disputes appears to us indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society." (*Thornhill v. Alabama* (1940) 310 U.S. 88, 102-103 [60 S.Ct. 736, 744, 84 L.Ed. 1093], citations omitted.)

In enacting the NLRA, Congress declared: "The inequality of bargaining power between employees . . . and employers . . . substantially burdens

and affects the flow of commerce, and tends to aggravate recurrent business depressions, by depressing wage rates and the purchasing power of wage earners in industry and by preventing the stabilization of competitive wage rates and working conditions within and between industries. [¶] . . . [¶]

"It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred . . . by protecting the exercise by workers of full freedom of association . . . for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." (29 U.S.C. § 151.)

Although California does not have a state statutory scheme comparable to the NLRA (see *Petri Cleaners, Inc. v. Automotive Employees, etc. Local No. 88* (1960) 53 Cal.2d 455, 469-475 [2 Cal.Rptr. 470, 349 P.2d 76]), in 1937, the California Legislature enacted Labor Code section 923, which states: "[T]he *public policy* of this State is declared as follows: [¶] Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees. . . . [I]t is necessary that the individual workman have full freedom of association . . . to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in . . . concerted activities for the purpose of . . . mutual aid or protection." (Stats. 1937, ch. 90, § 923, pp. 208-209, italics added.)

"By enactment of Labor Code section 923 [the Legislature] adopted general policies and provided general rights and obligations of labor and management throughout the state. . . . The total effect of all this legislation was . . . to create uniform fair labor practices . . . ." (*Professional Fire Fighters, Inc. v. City of Los Angeles* (1963) 60 Cal.2d 276, 294-295 [32 Cal.Rptr. 830, 384 P.2d 158], overruled on another point in *Bishop v. City of San Jose* (1969) 1 Cal.3d 56, 63, fn. 6 [81 Cal.Rptr. 465, 460 P.2d 137].)

"The Legislature has expressly declared [in Labor Code section 923] that the public policy of California favors concerted activities of employees for the purpose of . . . mutual aid or protection." (*Schwartz-Torrance Investment Corp. v. Bakery & Confectionery Workers' Union* (1964) 61 Cal.2d 766, 769 [40 Cal.Rptr. 233, 394 P.2d 921].) And because "the language and policy of section 923 and other sections of our Labor Code are similar to that of the National Labor Relations Act[,] . . . federal decisions in the field of labor-management relations are persuasive." (*American Radio Assn. v. Superior Court* (1965) 237 Cal.App.2d 891, 897 [47 Cal.Rptr. 419]; accord, *Englund v. Chavez* (1972) 8 Cal.3d 572, 589-592 [105 Cal.Rptr. 521, 504

P.2d 457].) Thus, section 923 of the Labor Code, like the NLRA, recognizes that an employee's right to discuss wages is of public importance.

Further, over 40 years ago, when wrongful termination law was in its infancy, Division Two of this court held that a violation of Labor Code section 923 could support a public policy claim. (*Glenn v. Clearman's Golden Cock Inn* (1961) 192 Cal.App.2d 793, 796-798 [13 Cal.Rptr. 769].) More recently, Division Three of the First Appellate District reached the same conclusion. (*Gelini v. Tishgart* (1999) 77 Cal.App.4th 219 [91 Cal.Rptr.2d 447].)

While neither *Glenn* nor *Gelini* involved wage issues, they support the general notion that Labor Code section 923 is premised on rights that reach beyond the interests of a single employer or employee. In short, Grant-Burton's wrongful termination claim is based on a policy—codified under federal and state law—that inures to the benefit of the public.[1]

 c. *Policy in Effect at Time of Discharge*

The next requirement of a public policy claim—that the policy be well established at the time of discharge—is easily met. Labor Code section 232 was enacted in 1984. (Stats. 1984, ch. 814, § 1, pp. 2836-2837.) Labor Code section 923 was enacted in 1937. (Stats. 1937, ch. 90, § 923, p. 208.) And the rights and obligations imposed by federal law have existed for decades. For instance, the NLRA was enacted in 1935. (See NLRA, ch. 372, 49 Stat. 449.) " '[An] employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes . . . .' " (*Silo v. CHW Medical Foundation, supra*, 27 Cal.4th at p. 1104.)

 d. *Fundamental and Substantial Policy*

The final requirement of a public policy claim appears to require a discussion of two concepts—whether the policy is "fundamental" and "substantial." However, those terms are not treated separately but are viewed as one requirement. (*Stevenson, supra*, 16 Cal.4th at p. 890, fn. 4.) In this case, the applicable public policy meets that standard. "The private employee's right to . . . concerted activity [is] now 'fundamental' under national legislative policy . . . ." (*Alaniz v. City of San Antonio* (W.D.Tex. 1971) 69 Lab.

---

[1] The NLRA protects the concerted activities of employees, with the exception of supervisors. (See *Ruscigno v. American National Can Co.* (2000) 84 Cal.App.4th 112, 119, fn. 3 [100 Cal.Rptr.2d 585].) Here, the record does not support a finding or inference that Grant-Burton or the other marketing directors were supervisors. (See 29 U.S.C. § 152(3), (11) [defining "employee" and "supervisor"].) In addition, Labor Code section 923 *does* protect the concerted activities of supervisors, at least to the extent not preempted by the NLRA. (*Knopf v. Producers Guild of America, Inc.* (1974) 40 Cal.App.3d 233, 244-251 [114 Cal.Rptr. 782].)

Cas. (CCH) ¶ 52,940, p. 69133 [80 L.R.R.M. (BNA) 2983, 2985].) "The enactment of the NLRA . . . marked a fundamental change in the Nation's labor policies. Congress expressly recognized that collective organization of segments of the labor force . . . may produce benefits for the entire economy in the form of higher wages, job security, and improved working conditions." (*Sears, Roebuck & Co. v. Carpenters* (1978) 436 U.S. 180, 190 [98 S.Ct. 1745, 1754, 56 L.Ed.2d 209].)

Based on the foregoing analysis, Grant-Burton has made a prima facie showing of a valid public policy claim. The evidence would support a finding that she was "discharged for . . . exercising . . . a statutory . . . right" (*Pettus v. Cole* (1996) 49 Cal.App.4th 402, 454 [57 Cal.Rptr.2d 46]), namely, the right to discuss wages with her coworkers.

It matters not that some employees may be offended by a discussion about wages. "[D]issatisfaction due to low wages is the grist on which concerted activity feeds. Discord generated by what employees view as unjustified wage differentials also provides the sinew for persistent concerted action. The possibility that ordinary speech and discussion over wages . . . may cause 'jealousies and strife among employees' is not a justifiable business reason to inhibit the opportunity for an employee to exercise . . . rights [under the NLRA]." (*Jeannette Corp. v. NLRB* (3d Cir. 1976) 532 F.2d 916, 919.)

### 2. *The Meaning of "Wages"*

 Section 232 protects an employee who discloses his or her "wages," which is broadly defined to include "all amounts for labor performed." (Lab. Code, § 200, subd. (a).) The bonuses paid to three or four of Covenant Care's marketing directors were based on an increase in the number of patients at the facility or an increase in growth at the facility. As such, a bonus comes within the definition of "wages."

Covenant Care argues that "wages" should be narrowly construed to mean compensation that an employee has *already* earned or to which he or she is *already* entitled. Under this definition, an effort by employees to obtain a pay increase would not involve "wages" and, as a result, would not be covered by section 232. As Covenant Care sees it, Grant-Burton was not protected by section 232 because the marketing directors discussed a type of compensation—a bonus—that she did not already receive.

This argument, if accepted, would render section 232 virtually meaningless. The very purpose of the statute is to protect employees who want to

discuss some aspect of their compensation, for example, a possible increase in pay, perceived disparities in pay, or the awarding of bonuses. Under the NLRA, employees are permitted to discuss compensation without regard to what they already earn or are already entitled to receive. (See pt. II.B.1.b., *ante.*) We interpret "wages," as used in section 232, to permit the same kind of discussion as allowed under the NLRA. (See *Englund v. Chavez, supra,* 8 Cal.3d at pp. 589-592; *American Radio Assn. v. Superior Court, supra,* 237 Cal.App.2d at p. 897; *San Diego Gas & Electric Co. v. City of Carlsbad* (1998) 64 Cal.App.4th 785, 793-794 [75 Cal.Rptr.2d 534].)

The cases on which Covenant Care relies are easily distinguished. They have nothing to do with section 232. Rather, they involve "waiting time" penalties imposed under Labor Code section 203, which requires, among other things, that the compensation due a terminated employee be paid within a specified period after termination. Naturally, a late paycheck includes only what the employee has already earned and the amount to which he or she is already entitled. (See, e.g., *Mamika v. Barca* (1998) 68 Cal.App.4th 487 [80 Cal.Rptr.2d 175]; *Triad Data Systems, Inc. v. Jackson* (1984) 153 Cal.App.3d Supp. 1 [200 Cal.Rptr. 418]; *Oppenheimer v. Sunkist Growers* (1957) 153 Cal.App.2d Supp. 897.) Those cases do not indicate, or even suggest, that an employer can lawfully discharge employees for discussing the fairness of their compensation.

### 3. *The "Amount" of Wages*

Under section 232, an employee is protected for "disclos[ing] the *amount* of his or her wages." (Italics added.) Covenant Care argues that section 232 does not apply in this case because the marketing directors did not disclose the amount of their compensation. We disagree.

Just as we have interpreted Labor Code section 923 in accordance with the NLRA (see pt. II.B.1.b., *ante*), we construe "amount," as used in section 232, in the same manner (see *Englund v. Chavez, supra,* 8 Cal.3d at pp. 589-592; *American Radio Assn. v. Superior Court, supra,* 237 Cal.App.2d at p. 897; *San Diego Gas & Electric Co. v. City of Carlsbad, supra,* 64 Cal.App.4th at p. 793). As stated, the NLRA grants employees the right to discuss wages. (See *N.L.R.B. v. Brookshire Grocery Co., supra,* 919 F.2d at p. 362; *Wilson Trophy Co., supra,* 307 NLRB at p. 511.) Indeed, "a rule which prohibits employees from discussing wages among themselves . . . violates the [NLRA]." (*Koronis Parts, Inc., supra,* 324 NLRB at p. 694.) And activity protected under the NLRA cannot be penalized under state law. (See *Hillhaven Oakland Nursing etc. Center v. Health Care Workers Union* (1996) 41 Cal.App.4th 846, 853-857 [49 Cal.Rptr.2d 11].)

An "amount" of wages can be disclosed without mentioning dollars and cents. Such a disclosure necessarily includes the discussion of a pay structure that allows for an increase or decrease in wages through the awarding of bonuses. Grant-Burton did not receive a bonus. The amount of her wages in that respect was zero. Simply put, the amount of wages paid to a marketing director depended on whether he or she received a bonus.[2]

### 4. *"Good Cause" for Termination*

 Covenant Care contends that, as a matter of law, it had good cause to discharge Grant-Burton based on her allegedly poor performance and unprofessional conduct. We conclude otherwise.

At the outset, we note that Covenant Care cites only its own separate statement in support of its contention. As we have previously explained: "Under California Rules of Court, rule 15(a), '[t]he statement of any matter in the record shall be supported by appropriate reference to the record.' As to statements of fact, rule 15(a) is intended to direct the appellate court to evidence in the record. . . . Here, [a] part[y] repeatedly cite[d] [its] own 'separate statement' (see Code Civ. Proc., § 437c, subd. (b)) as the *sole* support for numerous 'facts.' However, a separate statement is not evidence; it *refers* to evidence submitted in support of or opposition to a summary judgment motion. In an appellate brief, an assertion of fact should be followed by a citation to the page(s) of the record containing the supporting evidence. . . . [W]e do not suggest that citations to a separate statement cannot be helpful. For example, where the separate statement of the party opposing summary judgment indicates that a fact is undisputed, a citation to that page of the separate statement is of valuable assistance." (*Jackson v. County of Los Angeles, supra*, 60 Cal.App.4th at p. 178, fn. 4, italics in original.) Nor is there a problem with citing the separate statement *and* the pertinent evidence.

 Similarly, an assertion of fact on appeal carries no weight where the cited source is the same unsupported assertion made in the trial court, be it in the memorandum of points and authorities or stated by counsel at the

---

[2]Depending on the circumstances, federal labor law may preempt a state law claim. (See *San Diego Unions v. Garmon* (1959) 359 U.S. 236, 244-248 [79 S.Ct. 773, 779-782, 3 L.Ed.2d 775]; *Inter-Modal Rail Employees Assn. v. Burlington Northern & Sante Fe Ry. Co.* (1999) 73 Cal.App.4th 918, 924-927 [87 Cal.Rptr.2d 60].) The parties did not raise or discuss this issue below or on appeal. Because the question of preemption is jurisdictional and cannot be waived (*Longshoremen v. Davis* (1986) 476 U.S. 380, 387-393 [106 S.Ct. 1904, 1910-1913, 90 L.Ed.2d 389]), the trial court should address it on remand. In that regard, Covenant Care has the burden of showing that Grant-Burton's claim is preempted. (*Id.* at pp. 394-399 [106 S.Ct. at pp. 1914-1917].)

hearing on the motion. An unsupported assertion below does not become a "fact" on appeal simply by repetition. And the trial court's explanation of its decision—whether by order, statement of decision, judgment, oral pronouncement, or other form—is not evidence. Factual assertions on appeal cannot rest solely on citations to the decision of the trial court. It is the evidence supporting or opposing the trial court's decision that is important.

 " 'It is the duty of a party to support the arguments in its briefs by appropriate reference to the record, which includes providing exact page citations.' " (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856 [85 Cal.Rptr.2d 521].) Because "[t]here is no duty on this court to search the record for evidence" (*Belli v. Curtis Pub. Co.* (1972) 25 Cal.App.3d 384, 394, fn. 5 [102 Cal.Rptr. 122]), an appellate court *may* disregard any factual contention not supported by a proper citation to the record (*Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1154 [61 Cal.Rptr.2d 207]; *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [21 Cal.Rptr.2d 834]).

 Nevertheless, we reject Covenant Care's "good cause" argument on the merits. Although Covenant Care asserts that Grant-Burton was discharged for several legitimate reasons, the record supports a finding that she was terminated, at least in part, because she participated in the discussion about bonuses. That was an unlawful reason.

"In some cases, the evidence will establish that the employer had 'mixed motives' for its employment decision. . . . In a mixed motive case, both legitimate and illegitimate factors contribute to the employment decision." (*Heard v. Lockheed Missiles & Space Co., Inc.* (1996) 44 Cal.App.4th 1735, 1748 [52 Cal.Rptr.2d 620].) "Once the [employee] establishes . . . that an illegitimate factor played a motivating or substantial role in an employment decision, the burden falls to the [employer] to prove by a preponderance of the evidence that it would have made the same decision even if it had not taken the illegitimate factor into account." (*Grant v. Hazelett Strip-Casting* (2d Cir. 1989) 880 F.2d 1564, 1568; see *Martori Brothers Distributors v. Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721, 729-730 [175 Cal.Rptr. 626, 631 P.2d 60].)[3] Because Covenant Care has not established that it would have discharged Grant-Burton regardless of the discussion about bonuses, we cannot say that, as a matter of law, her discharge was for good cause.

---

[3]In 1991, Congress enacted legislation governing the elements of proof and available remedies in mixed-motive cases arising under certain federal antidiscrimination statutes. (See *Gagnon v. Sprint Corp.* (8th Cir. 2002) 284 F.3d 839, 847-848; *Weston Smith v. Cooley Dickinson Hospital Inc.* (1st Cir. 2002) 282 F.3d 60, 64.) That legislation did not purport to change mixed-motive analysis in cases arising under state law.

 In sum, Grant-Burton's wrongful termination claim is based on a policy that is supported by statute, inures to the benefit of the public, was well established at the time of discharge, and is fundamental and substantial. Her claim is also supported by evidence that she was terminated in violation of that public policy, namely, the right of employees to discuss their compensation with one another—a right protected by the NLRA and section 232. Thus, the summary adjudication of the wrongful termination claim must be reversed.

### C. *Defamation**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III

### DISPOSITION

The judgment is reversed as to the adjudication of the cause of action for wrongful termination in violation of public policy and is affirmed as to the adjudication of the claim for defamation. Appellant is entitled to costs on appeal.

Spencer, P. J., and Vogel (Miriam A.), J., concurred.

A petition for a rehearing was denied July 30, 2002, and the opinion was modified to read as printed above.

---

*See footnote, *ante*, page 1361.